NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11710

COMMONWEALTH  vs.  MICHAEL COLLINS.


Suffolk.     September 2, 2014. - December 17, 2014.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk,
& Hines, JJ.


Homicide.  Armed Assault with Intent to Murder.  Firearms.
    Constitutional Law, Assistance of counsel, Identification,
    Search and seizure, Public trial.  Practice, Criminal,
    Assistance of counsel, Failure to object, Identification of
    defendant in courtroom, Agreement between prosecutor and
    witness, Conduct of prosecutor, Disclosure of evidence,
    Witness, Sequestration of witnesses, Public trial,
    Empanelment of jury.  Evidence, Identification,
    Exculpatory, Disclosure of evidence, Impeachment of
    credibility.  Witness, Credibility, Impeachment.  Cellular
    Telephone.  Search and Seizure, Warrant.  Jury and jurors.


    Indictments found and returned in the Superior Court
Department on February 20, 2007.

    The cases were tried before Raymond J. Brassard, J., and a
motion for a new trial was heard by him.

    The Supreme Judicial Court granted an application for
direct appellate review.


    Ruth Greenberg for the defendant.
    Cailin M. Campbell, Assistant District Attorney, for the
Commonwealth.

GANTS, C.J.  A jury in the Superior Court convicted the defendant of murder in the second degree for the killing of Myles Lawton.  The defendant also was convicted of armed assault with intent to murder for the shooting of Pierre Laguerre, and of possession of an unlicensed firearm.[1]  Represented by new counsel, the defendant moved for a new trial.  The trial judge denied the motion in part on the papers, and denied the remaining part of the motion following an evidentiary hearing regarding the defendant's allegation of prosecutorial misconduct.  The defendant appealed both the convictions and the denial of the motion for a new trial, and we granted direct appellate review.

On appeal, the defendant claims that (1) he was denied his right to the effective assistance of counsel because of his attorney's failure to object to the in-court identification of the defendant by an eyewitness who previously had been unable to make a positive identification of the defendant when the police showed her a photographic array; (2) the prosecutor withheld exculpatory evidence of the promises, rewards, and inducements the Commonwealth provided to Laguerre in return for his testimony at trial regarding his pending drug distribution case;

---

[1] The defendant had been indicted for murder in the first degree, and was found guilty of the lesser offense.  He was found not guilty on an indictment alleging the armed robbery of Pierre Laguerre.

(3) the trial judge erred in admitting cellular telephone records that revealed the switching stations that handled cellular telephone calls allegedly made by the defendant and thereby revealed the location of the telephone within a radius of approximately one hundred miles, where those records were obtained by court order rather than with a search warrant; (4) he was denied his right to the effective assistance of counsel when his attorney failed to object to the enforcement of a sequestration order during jury selection; and (5) his Federal constitutional rights were violated by his conviction of possession of an unlicensed firearm, where the Commonwealth did not prove that the defendant lacked a license to carry firearms. Based on these claims, the defendant asks us to vacate the convictions, dismiss the indictment for possession of an unlicensed firearm, and order a new trial on the remaining two indictments. We affirm the defendant's convictions and the denial of his motion for a new trial.

Background. We summarize the evidence at trial, reserving discussion of the evidence that pertains to the issues on appeal. Laguerre testified that, before December 5, 2006, he and the defendant, whom Laguerre knew only by the name "Goodie," agreed that Laguerre would purchase two kilograms of cocaine

from the defendant at a price of $38,000.[2]  On December 5, Lawton drove Laguerre to meet the defendant, who was wearing a New York Mets jacket and driving a white Mercury Mountaineer sport utility vehicle (SUV) with Rhode Island license plates.  The three went to a second-floor apartment in the Dorchester section of Boston that was rented by Teresa Jones, who was Lawton's girl friend, where Laguerre showed the defendant the bag containing the cash.  The defendant left the apartment and said he would be back.  The defendant returned that evening, driving the same SUV and wearing the same jacket.  Lawton went down to the first floor to let him in the building.  When they entered the second-floor apartment, Lawton told Laguerre, "[H]e's bullshitting.  He want[s] the money."  The defendant then "pulled the gun out," and asked Laguerre for the money.  Laguerre refused.  When Lawton ran "at [Laguerre] to give the money" to the defendant, the defendant "smacked [Lawton] in the back of his head and shot him."  Laguerre broke a window in the apartment with his elbow so he could call for help, and the defendant fired a shot at him, missing his head by inches.  The defendant fired three more shots at Laguerre, striking him twice in the chest and once in the elbow.  The defendant then took the bag containing the money and left.  The wounded Laguerre walked down the stairs and left

_____

[2] Laguerre testified that he thought it was such a "good deal" that he decided to give the defendant an extra $2,000, for a total of $40,000, at the time of the exchange.

the apartment building.  In front of the building, a police officer asked him who had shot him.  He answered, "Goodie."[3]

The only other people in the apartment at the time of the shooting were Jones and her one year old grandson, who were lying in bed in the bedroom, with the door closed, watching television.  Jones testified that, before any shots were fired, the bedroom door opened and a man whom Jones had never seen before stood in the doorway "for a second" and looked at her.  When he closed the door, Jones got up to see who the man was, but then heard shooting.  She "peeked out" of the door "for a second"; heard the man say "get the money"; and saw him shooting into the living room and hitting Lawton over the head with the firearm.  She closed the door and heard more shooting.

Jones's downstairs neighbors, Desmond and Melissa Sheets, heard banging noises upstairs at approximately 9:30 P.M., and Melissa asked her husband to go upstairs and tell them to keep the noise down.  When Desmond arrived at the top of the landing, he saw a man wearing a Mets jacket with a semiautomatic firearm

---

[3] A Boston police officer testified that Laguerre said that "Goldie" had shot him.  But Laguerre testified that he did not know anyone named "Goldie," and that the mistake might be attributable to Laguerre's thick accent.  When the police later showed him an array of photographs at the hospital, Laguerre identified a photograph of the defendant as the shooter and wrote on the back of the photograph:  "That's him, Goodie.  He shot me and [Myles Lawton]."  At the time of the shooting, Laguerre had known the defendant for eighteen months from a strip club where they were both regular customers.

in his right hand emerge from the second-floor apartment.  The man said, "Dude, I got a gun," and proceeded downstairs at a fast pace.  When Desmond was shown a photographic array, he said that a photograph of the defendant "could pass for" the man he saw, based on similarities in their facial features and facial hair.  Asked by the police to state his degree of certainty in the identification, Desmond said he was seventy-five per cent sure that the photograph of the defendant showed the man.

On December 6, the defendant accompanied Tiffany Lanides, with whom he had a romantic relationship, to an automobile rental agency, where she returned a white Mercury Mountaineer SUV with Rhode Island license plates that she had rented.[4] Lanides knew the defendant by the name "Goodie," and testified that the defendant drove the vehicles that she rented.

The defendant was arrested in Washington, D.C., on December 21.  A New York Mets jacket was retrieved from the vehicle he was in when he was arrested.  In the defendant's pocket were business cards with the name "Goodie" in the upper left-hand corner, above the letters "CEO."

The defendant also was implicated in a double shooting in Chelsea that occurred on July 28, 2006.  One of the victims,

---

[4] Tiffany Lanides had just renewed the rental agreement for the sport utility vehicle on December 5, 2006.  She testified that she returned the vehicle because "something was wrong with it."

John Arnold, told police that "Goodie" had shot him, and was later shown a photographic array where he identified the defendant as the shooter.[5]  Spent shell casings collected from Jones's Dorchester apartment were compared with spent shell casings collected from the Chelsea shooting, and with the spent shell casings collected from the test-firing of a firearm that had been recovered near a highway on-ramp in Boston.  Detectives from the Boston police department firearms analysis unit testified that in their opinion the Chelsea casings, the Dorchester casings, and the test-fired casings were fired from the same firearm, and that there was only a "small" probability that they were fired from different weapons.

Discussion.  1.  Jones's in-court identification of the defendant.  On January 5, 2007, Boston police Detective Juan Tores showed Jones a photographic array consisting of eight photographs.  Detective Tores had not been involved in the investigation of this homicide and did not know which photograph depicted the defendant.  The photographic array was sequential rather than simultaneous, that is, Jones was shown only one photograph at a time, and was allowed to take as much time as she wanted to view the photographs.  The defendant's photograph

_____

[5] During his testimony at the defendant's trial for the shooting of Lawton and Laguerre, John Arnold claimed not to remember the photographic array, and denied having told police that Goodie had shot him.  He also stated, "I'm not a snitch."

was the fourth shown to her.  Detective Tores testified that Jones said "no" after viewing each of the eight photographs.[6] When she saw the eighth photograph, the last one shown to her, she "held [it] a lot longer than any of the other photos," and "stated that it was between" no. eight and no. four.[7]  She then asked the detective if she could see the individuals depicted in the photographs "from a side view," and the detective told her he could not provide that.

During her direct examination at trial more than two years later in May, 2009, Jones was not asked to make an in-court identification of the defendant, but she testified about her earlier viewing of the photographic array.  She said that she had pointed out photographs no. four and no. eight to the police, and testified that photograph no. four looked more like the person at her bedroom door.  After defense counsel had questioned her on cross-examination about the discrepancy between her trial testimony and Detective Tores's police report regarding whether she previously had ever stated that photograph no. four looked more like the person than photograph no. eight did, Jones said on redirect examination that the reason she was

---

[6] During her cross-examination at trial, Teresa Jones claimed she said, "I don't know," rather than "no," when she saw photograph no. four.

[7] In her testimony at trial, Jones said that, when she viewed the photographic array, she stopped and pointed out to the police photographs no. four and no. eight.

unable to make a positive identification from the photographic array was that she only saw the man at her bedroom door "from the side."  The prosecutor asked, "Do you see the person in the court room today who you saw in your apartment that night?" Without objection, Jones answered, "Yes, I do," and pointed to the defendant.

The defendant contends that he was denied the effective assistance of counsel by his attorney's failure to object to the in-court identification, which he claims was inadmissible as "a one-man showup without advance notice to counsel."  In Commonwealth v. Crayton, ante     (2014), which we issued today, we considered whether a judge erred in admitting, over objection, an in-court identification of the defendant by a witness who had not participated in any pretrial identification procedure.  We explained in Crayton:

> "Although we have adopted a 'rule of per se exclusion' for unnecessarily suggestive out-of-court identifications, we have not adopted such a rule for in-court identifications, despite their comparable suggestiveness. . . .  Instead, we have excluded an in-court identification only where it is tainted by an out-of-court confrontation . . . that is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. . . .  In essence, we have excluded in-court identifications only where their inherent suggestiveness is magnified by the impermissible suggestiveness of an out-of-court identification. Therefore, here, where there had been no out-of-court identification to taint the in-court identification, the judge's admission of the in-court identification conformed to our case law."

Id. at    (quotations and citations omitted).  Here, the witness had participated in a pretrial identification procedure that is not alleged to have been suggestive, and failed to make a positive identification of the defendant, although she did identify his photograph as one of two that looked like the person she saw at her bedroom door.  As in Crayton, the judge's admission of the in-court identification conformed to our case law, and we conclude that defense counsel was not ineffective for failing to make an objection that would have been futile under the prevailing case law.  See Commonwealth v. Conceicao, 388 Mass. 255, 264 (1983) ("It is not ineffective assistance of counsel when trial counsel declines to file a motion with a minimal chance of success").  Cf. Minkina v. Frankl, 86 Mass. App. Ct. 282, 289 (2014) ("[I]t is not malpractice to fail to advocate for or anticipate a substantial change in law requiring the overruling of a controlling precedent").  However, as in Crayton, we revisit the wisdom of our case law regarding the admission of in-court identifications in the circumstances reflected in this case.

In Crayton, we concluded that an "in-court identification is comparable in its suggestiveness to a showup identification," supra at    , and may even be more suggestive because "where the prosecutor asks the eyewitness if the person who committed the

crime is in the court room, the eyewitness knows that the defendant has been charged and is being tried for that crime."

Id. at    .  We declared:

> "Where an eyewitness has not participated before trial in an identification procedure, we shall treat the in-court identification as an in-court showup, and shall admit it in evidence only where there is 'good reason' for its admission.  The new rule we declare today shall apply prospectively to trials that commence after issuance of this opinion, and shall apply only to in-court identifications of the defendant by eyewitnesses who were present during the commission of the crime."  (Footnote omitted.)

Id. at    .  We consider here whether to adopt that rule where the eyewitness did participate before trial in a nonsuggestive identification procedure and made something less than an unequivocal positive identification of the defendant.[8]  For the reasons described below, we conclude that the new rule also applies in these circumstances.

The danger posed by admitting in evidence an in-court identification where there has been no pretrial identification procedure is somewhat different from the danger posed by the admission in evidence of an in-court identification where there has been an earlier identification procedure that produced something less than an unequivocal positive identification. With the former, the danger is that the jury must evaluate the

---

[8] We do not address the admissibility of an in-court identification where there has been a suggestive pretrial identification procedure.

accuracy of the in-court identification without the benefit of a nonsuggestive pretrial identification procedure.  With the latter, the danger is that the jury may disregard or minimize the earlier failure to make a positive identification during a nonsuggestive identification procedure, and give undue weight to the unnecessarily suggestive in-court identification.[9]

The danger of unfairness arising from an in-court showup in these circumstances is considerable.  Where eyewitnesses before trial were unable to make a positive identification of the defendant or lacked confidence in their identification, they are likely to regard the defendant's prosecution as confirmation that the defendant is the "right" person and, as a result, may develop an artificially inflated level of confidence in their in-court identification.  See Supreme Judicial Court Study Group on Eyewitness Evidence:  Report and Recommendations to the

---

[9] In addition, an in-court identification that follows an out-of-court identification procedure where the witness failed to make a positive identification of the defendant poses the danger that occurs whenever an eyewitness participates in multiple identification procedures:  the danger of confusion of source memory.  An eyewitness may recall the defendant's face, but not recall that the source of the eyewitness's memory was the defendant's presence in a pretrial lineup or photographic array rather than the defendant's presence at the scene of the crime.  See Supreme Judicial Court Study Group on Eyewitness Evidence:  Report and Recommendations to the Justices 78-79 (July 25, 2013) (SJC Study Group Report), citing State v. Henderson, 208 N.J. 208, 255-256 (2011), and Deffenbacher, Bornstein, & Penrod, Mugshot Exposure Effects:  Retroactive Interference, Mugshot Commitment, Source Confusion, and Unconscious Transference, 30 Law & Hum. Behav. 287, 299 (2006).

Justices 69 (July 25, 2013) (SJC Study Group Report).[10,11]  Where

confirmatory feedback artificially inflates an eyewitness's

level of confidence in his or her identification, there is also

a substantial risk that the eyewitness's memory of the crime at

trial will "improve."  As studies have shown, an eyewitness, now

certain that the defendant was the perpetrator of the crime she

[10] As explained in the SJC Study Group Report, "[w]itnesses who receive confirming feedback[,] i.e., are told or otherwise made aware that they made a correct identification -- report higher levels of retrospective confidence than witnesses who receive either no feedback or disconfirming feedback. . . . [Moreover,] confirming feedback may inflate confidence to a greater degree in mistaken identifications than in correct identifications."  Id. at 69, citing Wells & Bradfield, "Good, You Identified the Suspect":  Feedback to Eyewitnesses Distorts Their Reports of the Witnessing Experience, 83 J. Applied Psychology 360 (1998) (Wells & Bradfield), and Bradfield, Wells, & Olson, The Damaging Effect of Confirming Feedback on the Relation Between Eyewitness Certainty and Identification Accuracy, 87 J. Applied Psychology 112, 115 (2002).

We also note that a recently released report from the National Research Council of the National Academies recognizes that "[i]n-court confidence statements may . . . be less reliable than confidence judgments made at the time of an initial out-of-court identification . . . .  The confidence of an eyewitness may increase by the time of the trial as a result of learning more information about the case, participating in trial preparation, and experiencing the pressures of being placed on the stand."  Identifying the Culprit:  Assessing Eyewitness Identification 75 (2014) (pending publication).

[11] Because "a witness's confidence in the accuracy of his identification grows once he learns that the police believe he made the correct identification," we have previously announced that we "expect" police to use protocols for photographic arrays that include a "procedure requir[ing] the administrator to ask the witness to state, in his or her own words, how certain he or she is of any identification."  Commonwealth v. Silva-Santiago, 453 Mass. 782, 791, 798 (2009).

observed, may recall that she saw the perpetrator more clearly, and saw more details of his appearance, than the witness had recalled during the nonsuggestive out-of-court identification procedure where she was unable to make a positive identification.  See SJC Study Group Report, supra at 82-83.[12] This enhancement of memory makes it more difficult for juries to assess the accuracy of an in-court identification.[13]  As a result, not only is an eyewitness likely to have an inflated level of confidence in an in-court showup identification, but a jury may give more weight to it than to the nonsuggestive

_____

[12] The SJC Study Group Report describes one frequently cited experimental study "in which witnesses, after making an incorrect identification from a target-absent lineup, were told either, 'Good, you identified the suspect,' 'Actually, the suspect was number ____,' or given no feedback at all. . . . The study found that the witnesses who received confirming feedback were not only more certain in the accuracy of their identification, but also reported having had a better view of the perpetrator, noticing more details of the perpetrator's face, paying closer attention to the event they witnessed, and making their identifications quicker and with greater ease than participants who were given no feedback or disconfirming feedback."  SJC Study Group Report, supra at 82-83, citing Wells & Bradfield, supra.

[13] Thus, a recent experimental study found that where witnesses were not given confirming feedback, fact finders could significantly discriminate between accurate and mistaken testimony, but where witnesses were given confirming feedback, the fact finders' ability to discriminate between accurate and mistaken testimony was "totally eliminated," because mistaken eyewitnesses delivered testimony that was just as credible as accurate eyewitness testimony.  See Smalarz & Wells, Post-Identification Feedback to Eyewitnesses Impairs Evaluators' Abilities to Discriminate Between Accurate and Mistaken Testimony, 38 Law & Hum. Behav. 194, 199-200 (2014).

pretrial identification that yielded something less than a positive identification.[14]

We previously have concluded that a witness's in-court identification is admissible where it "demonstrated greater certitude than did his [pretrial] photographic identifications," and left it to defense counsel on cross-examination to elicit evidence of the witness's "previous reservations" to diminish the weight of the in-court identification. See Commonwealth v. Paszko, 391 Mass. 164, 172 (1984), citing Commonwealth v. Correia, 381 Mass. 65, 79 (1980). But cross-examination cannot always be expected to reveal an inaccurate in-court identification where "most jurors are unaware of the weak correlation between confidence and accuracy and of witness susceptibility to 'manipulation by suggestive procedures or confirming feedback.'" SJC Study Group Report, supra at 20, quoting State v. Lawson, 352 Or. 724, 778 (2012). Nor do we in other circumstances rely on cross-examination to cure the dangers arising from an unnecessarily suggestive identification

---

[14] "Studies show that eyewitness confidence is the single most influential factor in juror determinations regarding the accuracy of an eyewitness identification." SJC Study Group Report, supra at 20, quoting State v. Lawson, 352 Or. 724, 778 (2012). See Cutler, Penrod, & Dexter, Juror Sensitivity to Eyewitness Identification Evidence, 14 Law & Hum. Behav. 185, 189-190 (1990) (out of ten criteria correlated with accuracy of eyewitness identifications, only eyewitness confidence had statistically significant influence on mock-jurors' guilty verdicts).

procedure. If the police, after an eyewitness failed to make a positive identification from a nonsuggestive lineup or photographic array, had conducted a showup <u>outside</u> the court room on the eve of trial, we would not admit the showup in evidence and rely on defense counsel in cross-examination to show that a positive identification arising from the showup should be given no weight in light of the earlier failure to make a positive identification. In light of the considerable danger that a jury may give undue and unfair weight to an unnecessarily suggestive showup identification, we shall not admit such an identification in evidence simply because it occurred in the court room rather than out of court. Therefore, where a witness before trial has made something less than an unequivocal positive identification of the defendant during a nonsuggestive identification procedure, we shall apply the new rule declared in <u>Crayton</u>, <u>supra</u> at 1, and admit the witness's in-court showup identification of the defendant only where there is "good reason" for it. Also, as in <u>Crayton</u>, this new rule shall apply prospectively to trials that commence after issuance of this opinion, and the rule shall apply only to in-court identifications of the defendant by eyewitnesses who were present during the commission of the crime.[15]

---

[15] As in <u>Crayton</u>, we do not address whether this new rule should apply to in-court identifications of the defendant by

In Crayton, where there had been no pretrial identification procedure, we noted that there may be "good reason" to conduct an in-court showup if a witness was familiar with the defendant before the commission of the crime, and therefore the risk of misidentification arising from the in-court showup is minimal. Id. at    .  But this "good reason" will not often exist where a witness has earlier failed to make a positive identification. In these circumstances, for an in-court showup to be admissible, it would need to be justified by some other "good reason" for permitting a suggestive identification procedure, which usually would require a showing that the in-court identification is more reliable than the witness's earlier failure to make a positive identification and that it poses little risk of misidentification despite its suggestiveness.[16]

Because the defendant did not object to the admission of the in-court identification and because the new rule we declare

---

eyewitnesses who were not present during the commission of the crime but who may have observed the defendant before or after the commission of the crime, such as where an eyewitness identifies the defendant as the person he or she saw inside a store near the crime scene a short time before or after the commission of the crime.

[16] For instance, there may be "good reason" for an in-court showup identification where the victim was familiar with the defendant (as in a domestic violence case) and only failed to identify the defendant in the earlier identification procedure because of fear or an unwillingness to cooperate with the police at the time.

here is prospective in its application, we need not determine whether there was "good reason" for the unnecessarily suggestive in-court showup here. It suffices that we conclude that no substantial risk of a miscarriage of justice arose from its admission in view of the partial identification that Jones made during the nonsuggestive pretrial identification procedure, considered together with the compelling evidence of the defendant's guilt.[17]

In the future, where an eyewitness to a crime has not made an unequivocal positive identification of the defendant before trial but the prosecutor nonetheless intends to ask the eyewitness to make an in-court identification of the defendant, we impose the same burden on the prosecutor as we did in Crayton to move in limine to admit the in-court identification,

---

[17] If the defendant had objected to the admission of the in-court showup identification, a judge could have evaluated the likelihood that Jones's earlier failure to make a positive identification resulted from the absence of a lineup or photographic array that provided a side view of the faces in the array, and the practicability of the police conducting such a side-profile lineup or photographic array. An in-court showup identification should not be admitted unless "good reason" is shown for not conducting a nonsuggestive identification procedure correcting the reason for the witness's earlier inability to make a positive identification. In the circumstances of this case, that would require "good reason" for not conducting an out-of-court lineup or photographic array that permitted the witness to view the defendant in profile alongside other profile views of individuals matching the witness's description of the shooter.

preferably before trial.[18]  See id. at    .  Once the motion is

made, the defendant would continue to bear the burden of showing

that the in-court showup would be unnecessarily suggestive and

that there is not "good reason" for it.  Id. at    .  Unless

there is "good reason" for the suggestive in-court

identification of the defendant -- and in the circumstances

described earlier in this paragraph there rarely will be -- the

identification evidence at trial from that eyewitness will be

limited to the less suggestive (and therefore perhaps less

positive) out-of-court identifications.

2.  Prosecutorial misconduct.  In his motion for a new

trial, the defendant argued that he did not receive a fair trial

because, among other things, the prosecutor engaged in

misconduct by failing to disclose an alleged deal with Laguerre

in exchange for Laguerre's testimony.  At the time of trial,

---

[18] The Commonwealth argues that Jones's in-court
identification should be admissible as rebuttal evidence because
the prosecution had elicited the in-court identification only on
redirect examination, after doubts had been raised during cross-
examination about Jones's pretrial identification.  But where
the strength of an eyewitness's pretrial identification is
successfully called into question during cross-examination,
appropriate rebuttal evidence would demonstrate the strength of
the witness's pretrial identification of the defendant, rather
than the confidence with which the witness might identify the
defendant at trial in a highly suggestive showup identification.
Therefore, where a witness before trial did not make an
unequivocal positive identification, an in-court identification
will not be admissible on either direct or redirect examination
unless a motion in limine by the prosecution has been granted.

drug distribution charges were pending against Laguerre in the Boston Municipal Court (BMC case).[19]  On the day the defendant's case was submitted to the jury, the Commonwealth reduced the distribution charge to possession of cocaine, and Laguerre admitted to sufficient facts for a finding of guilty on that lesser offense and was sentenced to a continuance without a finding for nine months.[20]  According to the defendant, the prosecutor previously had caused the BMC case to be continued until after Laguerre testified at the defendant's trial so that the prosecutor could influence the outcome of Laguerre's case depending on Laguerre's testimony.  Furthermore, the defendant argues, the prosecutor kept this information secret from the defense and the jury.  After an evidentiary hearing on the issue, the judge, in a thorough written decision, rejected the defendant's argument.

The Commonwealth is required to disclose exculpatory evidence to the defendant, including, as is relevant here, evidence that would tend to impeach the credibility of a key prosecution witness.  See Commonwealth v. Hill, 432 Mass. 704,

---

[19] The criminal complaint against Laguerre issued on July 9, 2007, after the December 5, 2006, incident that led to the charges against the defendant, and after Laguerre testified before the grand jury.  Laguerre was charged with distribution of cocaine, in violation of G. L. c. 94C, § 32A (c), and with committing a drug violation in a school zone, in violation of G. L. c. 94C, § 32J.

[20] The school zone charge was dismissed.

715 (2000). Such evidence clearly includes "[u]nderstandings, agreements, promises, or any similar arrangements between the government and a significant government witness." Id. at 715-716, citing Commonwealth v. Gilday, 382 Mass. 166, 175 (1980). Had there been any such deal with Laguerre in this case, the Commonwealth would have been required to disclose it. The judge, however, found that there was no such deal, and we conclude that his finding was not clearly erroneous. See, e.g., Commonwealth v. Torres, 437 Mass. 460, 469 (2002) (judge's findings of fact will not be disturbed on appeal unless clearly erroneous).

On the first day of trial, before the jury were empaneled, the prosecutor, Assistant District Attorney David Fredette, told the judge and defense counsel that Laguerre's BMC case was proceeding without any promises, rewards, or inducements. Fredette also noted, however, that Laguerre's attorney in that case, Scott Curtis, had been in touch with him about a deal and that the district attorney's office was considering whether to enter a nolle prosequi in the case but no decision had yet been made.

After an evidentiary hearing on the motion for a new trial, the judge found that the district attorney's office ultimately decided not to enter a nolle prosequi in Laguerre's case or to give Laguerre any considerations in exchange for his testimony

in the defendant's case. Fredette, whose testimony the judge credited, testified that the primary reason for deciding not to enter a nolle prosequi in Laguerre's case was that Curtis had told Fredette that Laguerre was going to cooperate regardless of whether the Commonwealth offered him a deal in the BMC case, and Fredette did not want to provide defense counsel with the argument that Laguerre was not credible because he was testifying in exchange for a deal from the Commonwealth in the BMC case. Curtis also testified at the defendant's trial that no promises had been made regarding how Laguerre's case would be resolved. Laguerre testified similarly, answering "No" when Fredette asked him, "[A]re you getting anything in exchange for your testimony here today?"

In addition to Fredette's testimony, the judge also credited the testimony of Assistant District Attorney Laura Montgomery, who was handling the BMC case at its conclusion. Montgomery testified that Fredette told her to handle Laguerre's case as she normally would and to document what she did. She also testified that on the date that Laguerre's BMC case was resolved, she did not know that Laguerre had already testified at the defendant's trial.

We conclude that the evidence adequately supported the judge's finding that "Laguerre was not given a deal on his BMC drug case in exchange for his testimony at [the defendant's]

trial." The evidence also adequately supported the judge's finding that Fredette disclosed to the judge, defense counsel, and the defendant that he wanted to enter a nolle prosequi in Laguerre's case but needed approval from his superiors, that Laguerre would likely testify at the defendant's trial before his own trial was scheduled, and that it was possible that Laguerre would receive an entry of nolle prosequi in exchange for his testimony. In addition, the evidence adequately supported the judge's finding that the potential for Laguerre to receive a favorable disposition in his BMC case in exchange for his testimony at the defendant's trial was fully presented to the jury. In short, the judge's findings were fully supported by the record, and there was no abuse of discretion in his denial of the defendant's motion for a new trial on the basis of prosecutorial misconduct.

3. <u>Admissibility of cellular telephone records</u>. Evidence was offered at trial that, at the relevant time, the defendant regularly used a cellular telephone registered to Lanides. During its investigation of the defendant, the Commonwealth sought and received a court order pursuant to the Federal Stored Communications Act, 18 U.S.C. § 2703(d) (2012), directing Sprint Nextel to disclose certain information associated with this cellular telephone number. Those records, with accompanying

testimony from a Sprint Nextel records custodian were admitted in evidence at trial.

The records included call detail records for the period from December 1, 2006, to December 15, 2006, which provided information about the telephone numbers from which the cellular telephone received incoming calls and the telephone numbers to which outgoing calls were made from the cellular telephone. The records also included information about "repoll" numbers that identify the mobile switching center through which a call is routed. The records custodian testified that a repoll number reveals the general area where the cellular telephone is at the time of a call, but does not provide a pinpoint location; that a repolling site can cover an area of up to 100 miles; and that a repoll number from the Washington, D.C., area would indicate that the cellular telephone for that call was "more likely" in Virginia, Maryland, or Washington, D.C., and "definitely not the Boston area." Taken together, the evidence indicated that the cellular telephone that the defendant was regularly using was in the Washington, D.C., area after December 7, 2006, which the Commonwealth suggested reflected that he fled Massachusetts for Washington, D.C., shortly after the killing, showing his consciousness of guilt.

The defendant argues that the judge erred in admitting the records in evidence, and that his trial counsel was ineffective

for failing to object to their admission.  He contends that the location information revealed from the repoll numbers could be obtained lawfully under art. 14 of the Massachusetts Declaration of Rights and the Fourth Amendment to the United States Constitution only with a search warrant based on probable cause. We disagree.

The defendant equates the repoll numbers at issue here with cell site location information (CSLI).  In Commonwealth v. Augustine, 467 Mass. 230 (2014), we concluded that government-compelled production of CSLI records that allowed the Commonwealth to track the defendant's movements for a two-week period "constituted a search in the constitutional sense to which the warrant requirement of art. 14 applied."  Id. at 254-255.  The repoll information provided in this case, however, is not comparable with CSLI, which, as we noted in Augustine, tracks the location of a cellular telephone user with such precision that it "implicates the same nature of privacy concerns as a [global positioning system] tracking device" and "may yield a treasure trove of very detailed and extensive information about the individual's 'comings and goings' in both public and private places."  Id. at 248, 251.  In sharp contrast, the repoll numbers merely reveal switching center information that identifies a general area -- perhaps as large as 100 miles -- where a cellular telephone was in use.  That

information does not trigger anything close to the privacy concerns raised by the detailed CSLI information that we considered in Augustine. See id. at 250-251.

Where telephone records reveal repoll numbers rather than CSLI, a search warrant is not required for their production. To obtain such records, it is sufficient that the Commonwealth obtain a court order pursuant to 18 U.S.C. § 2703(d), which requires "specific and articulable facts showing that there are reasonable grounds to believe that the contents of . . . the records . . . sought, are relevant and material to an ongoing criminal investigation." Because the telephone records in this case were obtained through such a court order, the Commonwealth did not violate the defendant's rights, under either art. 14 or the Fourth Amendment, and the judge did not err in admitting the call detail records in evidence. Where the records were not admitted in error, there is no basis for the defendant's claim that his counsel was ineffective in failing to object to their admission. See, e.g., Commonwealth v. Lykus, 406 Mass. 135, 140 (1989).

4. Court room closure. There is, similarly, no basis for the defendant's claim that his counsel was ineffective for failing to object to a purported closure of the court room. During the course of jury empanelment, it came to counsels' and the judge's attention that some of the defendant's family

members and friends who were also potential witnesses were in the court room.  There was, additionally, some indication that a family member or friend had spoken with a prospective juror, and that, in the court room, the potential witnesses had been speaking with each other in front of the jurors.[21]  Upon learning that potential witnesses were in the court room, the prosecutor asked that they be sequestered.  Defense counsel did not object, and the judge so ordered.  The defendant argues that barring potential witnesses from the court room during jury empanelment violated his Sixth Amendment right to a public trial and, further, that his counsel was ineffective for failing to understand that applying the sequestration order during jury selection was a violation of the defendant's rights.

Because a defendant has a right to a public trial, a judge may not permit even a partial closure of the court room at any time during the trial, including during jury selection proceedings, without first making specific findings that closure is necessary.  See Commonwealth v. Cohen (No. 1), 456 Mass. 94, 106-107 (2010), and cases cited.  It is plain that, after the jury are sworn, a sequestration order that excludes from the court room all persons whom the parties have identified as potential witnesses at trial does not constitute a partial

---

[21] It is unclear whether the individual or individuals who had spoken with the prospective juror were the same family or friends who were potential witnesses.

closure and therefore requires no specific findings that the sequestration is necessary.  See Commonwealth v. Buckman, 461 Mass. 24, 29 n.2 (2011), cert. denied, 132 S. Ct. 2781 (2012) ("The exclusion from the court room, pursuant to a sequestration order, of persons identified by the parties as witnesses is generally not considered to be a partial closure of the court room").  The issue presented here is whether excluding potential witnesses from the court room before the jury are sworn, specifically during jury selection, constitutes a partial closure that can be accomplished only with specific findings that closure is necessary.

A usual reason for the sequestration of potential witnesses is to prevent them from hearing the testimony of other witnesses, or from learning the content of such testimony during opening statements.  See Reporters' Notes to Rule 21, Mass. Ann. Laws Court Rules, Rules of Criminal Procedure, at 1649 (LexisNexis 2014-2015) ("The process of sequestration consists merely in preventing one prospective witness from being taught by hearing another's testimony").  See also Commonwealth v. Bianco, 388 Mass. 358, 369, S.C., 390 Mass. 254 (1983).  Where this is the sole reason to sequester, a sequestration order "ordinarily would not include the exclusion of such witnesses from the jury empanelment portion of the trial proceedings." Commonwealth v. Buckman, supra.  But that does not mean that a

judge is prohibited from including jury empanelment within the scope of a sequestration order.

The criminal rule of procedure governing the sequestration of witnesses, Mass. R. Crim. P. 21, 378 Mass. 892 (1979), imposes no such limitation, providing, "[u]pon his own motion or the motion of either party, the judge may, prior to or during the examination of a witness, order any witness or witnesses other than the defendant to be excluded from the court room." The reporters' notes to this rule recognize that "[t]he power of a judge to control the progress and, within the limits of the adversary system, the shape of a trial, is universally held to include the broad discretionary power to sequester witnesses before, during, and after their testimony." Reporters' Notes to Rule 21, supra at 1649, and cases cited. We conclude that the sequestration of potential witnesses at any time during the trial, including jury empanelment, is not a partial closure of the court room, because a defendant's right to a public trial does not include a right to have potential witnesses in the court room at any time during a trial. See Cohen (No. 1), 456 Mass. at 101 & n.10 (excluding potential witness from scope of defendant's Sixth Amendment challenge to alleged partial closure of court room during jury empanelment because potential witness "would not have been allowed in the court room for empanelment in any event because of a witness sequestration order in the

case").  See also Nicely v. State, 291 Ga. 788, 793-794 (2012), and cases cited (collecting "case upon case in which courts have held that the rule of sequestration ordinarily does not even implicate the right to public trial, much less infringe upon it").  Furthermore, the purpose of witness sequestration and the right to a public trial serve entirely different ends.  The latter allows the public to see that a defendant "is fairly dealt with and not unjustly condemned."  Waller v. Georgia, 467 U.S. 39, 46 (1984), quoting Gannett Co. v. DePasquale, 443 U.S. 368, 380 (1979).  The former "exercises a restraint on witnesses 'tailoring' their testimony to that of earlier witnesses; and it aids in detecting testimony that is less than candid."  Geders v. United States, 425 U.S. 80, 87 (1976).  If the right to a public trial entitled the defendant to have potential witnesses in the court room at any time, the broad discretion granted to judges to sequester witnesses would be as limited as a judge's power to order a partial closure of the court room, and would require the same specific findings as are required to determine that a partial closure is necessary.  See Cohen (No. 1), 456 Mass. at 107 (judge must make "case-specific determination that closure is necessary").  Cf. Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 581 (1980) (sequestration of witnesses is alternative to court room closure).  We decline to so

severely limit a judge's discretion to sequester potential witnesses.

Nor do we discern any abuse here of the judge's considerable discretion to sequester. The judge reasonably was concerned that potential witnesses were speaking with and in front of prospective jurors. He acted within his discretion to exclude the potential witnesses from jury empanelment, and that exclusion, as we have explained, did not amount to a partial closure of the court room. Because there was no court room closure, and the decision to sequester the potential witnesses from jury empanelment was within the judge's discretion, defense counsel was not ineffective for agreeing that the potential witnesses should be excluded from jury empanelment.

5. Firearm conviction. The defendant also argues that his conviction of the unlicensed possession of a firearm, in violation of G. L. c. 269, § 10 (a), violated his rights under both the Second and Fourteenth Amendments to the United States Constitution because the Commonwealth failed to prove that he did not have a license to carry the firearm. We rejected this same argument in Commonwealth v. Powell, 459 Mass. 572, 582 (2011), cert. denied, 132 S. Ct. 1739 (2012), and reject it here for the same reasons.

6. <u>Conclusion</u>.  For the reasons stated, the judgments of conviction and the denial of the motion for a new trial are affirmed.

<u>So ordered</u>.