JUSTICE HART, dissenting.
¶70 In Neil v. Biggers , the Supreme Court explained that when a procedure used to elicit eyewitness identification of a criminal defendant is "so unnecessarily suggestive and condu[cive] to irreparable mistaken identification that [the defendant] was denied due process of law" that procedure must be screened to ensure the reliability of the identification. 409 U.S. 188, 196, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) (quoting Stovall v. Denno , 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967) ). In Perry v. New Hampshire , the Court made clear that the requirement for this due process check "turn[s] on the presence of state action...." 565 U.S. 228, 233, 132 S.Ct. 716, 181 L.Ed.2d 694 (2012).
¶71 This case involves one of the most suggestive of all possible identification procedures-in-court identification. The in-court identifications made in this case were arranged by a prosecutor-a member of law enforcement. And they were conducive to *1121 irreparable misidentification because all three witnesses had failed to identify the defendant when presented with the opportunity to do so before trial. Mr. Garner was entitled to have the proposed eyewitness identifications screened by the judge to evaluate their likely reliability before or, if necessary, even during trial.[1]
¶72 The majority concludes that Perry settled the question of whether in-court identifications should be screened for reliability. In fact, Perry did not even consider that question. And while many courts since Perry have reached the conclusion that the majority reaches today, those courts have failed to adequately consider what a growing body of science and experience have taught us about eyewitness identifications. As a result, they have failed to take seriously the due process concerns raised by first-time in-court identifications.
A.
¶73 First-time in-court identifications are inherently suggestive. A witness appears in the courtroom, never having successfully identified the defendant before that moment, and is asked whether the defendant-the one person who the police and prosecutor believe they have enough evidence to try for the crime in question-is in fact the right one. "It is hard to imagine a situation more clearly conveying the suggestion to the witness that the one presented is believed guilty...." United States v. Wade , 388 U.S. 218, 234, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) (discussing show-up identification procedures). "The prosecutor, the witness, and everyone else in the courtroom are aware that the suspect is the individual seated at the defense table," and "[t]here is no way to safeguard the witness from influence caused by subtle cues in the prosecutor's questioning or not-so-subtle cues in the courtroom itself." Aliza B. Kaplan & Janis C. Puracal, Who Could it Be Now? Challenging the Reliability of First-Time In-Court Identifications After State v. Henderson and State v. Lawson, 105 J. Crim. L. & Criminology 947, 985 (2015). Witnesses faced with such a suggestive circumstance "may identify the defendant out of reliance on the prosecutor and in conformity with what is expected of them rather than because their memory is reliable." Commonwealth v. Crayton , 470 Mass. 228, 21 N.E.3d 157, 166-67 (2014).
¶74 In-court identifications, like other eyewitness identifications, are also remarkably fallible. Amicus curiae, the Innocence Project, has found that eyewitness misidentification is the leading cause of DNA-confirmed wrongful convictions, with more than 70 percent of DNA exonerations involving eyewitness misidentification. Brief of Amicus Curiae The Innocence Project, at 3. "Of those [exonerees], more than half (53 percent) were misidentified in court." Shirley LaVarco & Karen Newirth, Connecticut Supreme Court Limits In-Court Identification in Light of *1122 the Danger of Misidentification , The Innocence Project (Aug. 29, 2016), https://perma.cc/4TSS-6D5G. Significantly, scientific research has demonstrated that eyewitness identifications are less reliable with the passage of time. Nat'l Acad. of Sci., Identifying the Culprit: Assessing Eyewitness Identification 110 (2014) (hereinafter NAS Report).
¶75 Despite their lack of reliability, in-court identifications are also especially persuasive to a jury. As the majority acknowledges, "there is almost nothing more convincing than a live human being who takes the stand, points a finger at the defendant, and says 'That's the one!' " Watkins v. Sowders , 449 U.S. 341, 352, 101 S.Ct. 654, 66 L.Ed.2d 549 (1981) (Brennan, J., dissenting); see also United States v. Correa-Osorio , 784 F.3d 11, 29 (1st Cir. 2015) (Barron, J., concurring in part and dissenting in part) ("Eyewitness testimony is undeniably powerful. That testimony is all the more powerful when the eyewitness identifies the defendant right in front of the jury."); United States v. Hill , 967 F.2d 226, 231 (6th Cir. 1992) ("[O]f all the evidence that may be presented to the jury, a witness' in-court statement that 'he is the one' is probably the most dramatic and persuasive." (quoting United States v. Russell , 532 F.2d 1063, 1067 (6th Cir. 1976) )); State v. Henderson , 208 N.J. 208, 27 A.3d 872, 889 (2011) ("[T]here is almost nothing more convincing [to a jury] than" eyewitness identification of the defendant. (quoting Watkins , 449 U.S. at 352, 101 S.Ct. 654 (Brennan, J., dissenting))).
¶76 Unfortunately, in-court identification is also not susceptible to effective challenge through cross-examination because "cross-examination is far better at exposing lies than at countering sincere but mistaken beliefs." State v. Dickson , 322 Conn. 410, 141 A.3d 810, 832 (2016) (quoting State v. Guilbert , 306 Conn. 218, 49 A.3d 705, 725 (2012) ); see also NAS Report, supra , at 110. A witness who mistakenly believes that he is accurately identifying the defendant will come across in cross-examination as quite sincere and confident. And while confidence "is not a reliable predictor of the accuracy of the identification, especially where the level of confidence is inflated by its suggestiveness[,]" Crayton , 21 N.E.3d at 168, confidence can be very persuasive to a jury. In fact, "[s]tudies show that eyewitness confidence is the single most influential factor in juror determinations regarding the accuracy of an eyewitness identification." State v. Lawson , 352 Or. 724, 291 P.3d 673, 705 (2012). The impact of confidence on juror evaluation of an identification makes it very hard for cross-examination to undercut an in-court identification. And this is particularly troubling in light of the numerous studies showing that "under most circumstances, witness confidence or certainty is not a good indicator of identification accuracy." Id. at 704. It is for these reasons that some state supreme courts are rethinking reliance on cross -examination as a guard against mistaken eyewitness identification. See Dickson , 141 A.3d at 832 (noting that "cross-examination is unlikely to expose any witness uncertainty or weakness" in the in-court identification); Commonwealth v. Collins , 470 Mass. 255, 21 N.E.3d 528, 536 (2014) ("[C]ross-examination cannot always be expected to reveal an inaccurate in-court identification where most jurors are unaware of the weak correlation between confidence and accuracy and of witness susceptibility to manipulation by suggestive procedures or confirming feedback." (quoting Supreme Court Judicial Court Study Group on Eyewitness Evidence: Report and Recommendations to the Justices 20 (July 25, 2013) (internal quotation marks omitted))); Henderson , 27 A.3d at 918 (concluding that the state's earlier test for evaluating the reliability of eyewitness testimony rested too heavily on the assumption "that jurors would recognize and discount untrustworthy eyewitness testimony").
¶77 These characteristics of an in-court identification-its suggestiveness, fallibility, persuasiveness, and imperviousness to cross-examination-make first-time in-court identifications exactly the kind of identification procedure that is "conduc[ive] to irreparable mistaken identification...." Biggers , 409 U.S. at 196, 93 S.Ct. 375. That, of course, is not the end of the analysis. The question remains: Are first-time in-court identifications unnecessarily suggestive and are they the product of state action, such that they fall under the ambit of the Constitution's protections?
*1123 B.
¶78 Perry did not consider, and does not resolve, the question we confront here today. See Galloway v. State, 122 So.3d 614, 663 (Miss. 2013) ("The United States Supreme Court has not decided whether Biggers applies to an in-court identification not preceded by an impermissibly suggestive pretrial identification."), cert. denied , 572 U.S. 1134, 134 S.Ct. 2661, 189 L.Ed.2d 209 (2014) ; see also Dickson , 141 A.3d at 821 ("The United States Supreme Court has not yet addressed the question of whether first time in-court identifications are in the category of unnecessarily suggestive procedures that trigger due process protections."). The majority's reliance on Perry unmoors that case from its factual setting and ignores the parallels between an unnecessarily suggestive pretrial identification procedure arranged by one branch of law enforcement-the police-and an unnecessarily suggestive in-court identification arranged by another branch of law enforcement-the prosecution.
¶79 In Perry , the Court was confronted with the following question: "Do the due process safeguards against the State's use of unreliable eyewitness identification evidence at trial apply to all identifications which arise from impermissibly suggestive circumstances and which are very substantially likely to lead to misidentification, or only to those identifications which are also the product of 'improper state action'?" Brief for Petitioner at i, Perry , 565 U.S. 228 (No. 10-8974). The uniform focus of both the parties' briefs and the amicus briefs submitted to the Court in Perry was whether state action was or was not required to call into question the reliability of an eyewitness identification. See generally Brief for Petitioner, Perry , 565 U.S. 228 (No. 10-8974); Brief for Respondent, Perry , 565 U.S. 228 (No. 10-8974); Brief for the Am. Psychological Ass'n as Amici Curiae Supporting Petitioner, Perry , 565 U.S. 228 (No. 10-8974); Brief for the Nat'l Ass'n of Criminal Def. Lawyers as Amici Curiae Supporting Petitioner, Perry , 565 U.S. 228 (No. 10-8974); Brief for Wilton Dedge et al. as Amici Curiae Supporting Petitioner, Perry , 565 U.S. 228 (No. 10-8974); Brief for the Innocence Network as Amici Curiae Supporting Petitioner, Perry , 565 U.S. 228 (No. 10-8974); Brief for the Criminal Justice Legal Found. as Amici Curiae Supporting Respondent, Perry , 565 U.S. 228 (No. 10-8974); Brief for the State of Louisiana et al. as Amici Curiae Supporting Respondent, Perry , 565 U.S. 228 (No. 10 -8974); Brief for the United States as Amici Curiae Supporting Respondent, Perry , 565 U.S. 228 (No. 10-8974); Brief for the Nat'l Dist. Attorney's Ass'n as Amici Curiae Supporting Respondent, Perry , 565 U.S. 228 (No. 10-8974).
¶80 Of course, the context in which that question was being answered was a pretrial identification that had not been arranged by the police. The opinion, not surprisingly, in addressing the need for state action to implicate constitutional protections, focused on the need for police participation in the unnecessarily suggestive identification procedure. The only context in which Perry focused on in-court identification was when the Court rejected Mr. Perry's argument that any suggestive identification should be subject to judicial screening. 565 U.S. at 240-44, 132 S.Ct. 716. I agree with the majority that the Supreme Court's reasoning in Perry forecloses the conclusion that all in-court identifications should be screened merely because in-court identification always involves an element of suggestiveness. But the Court's reasoning in Perry and in Biggers does not foreclose-and, I believe, requires-judicial screening of some in-court identifications. See United States v. Morgan , 248 F.Supp.3d 208, 213 (D.D.C. 2017) ("Although the Supreme Court implied in Perry that it did not want all in-court identifications to be subject to judicial reliability screening, due process concerns require such screening for an initial in-court identification that is equivalent to a one-man showup." (internal citation omitted)). In particular, first-time in-court identifications like the one here are unnecessarily suggestive, conducive to irreparable misidentification, and arranged by law enforcement.
¶81 First-time in-court identifications are at least as suggestive as the pretrial identification processes disapproved of by this and other courts. Dickson , 141 A.3d at 822-23 ("[W]e are hard-pressed to imagine how there could be a more suggestive identification *1124 procedure than placing a witness on the stand in open court, confronting the witness with the person who the state has accused of committing the crime, and then asking the witness if he can identify the person who committed the crime. If this procedure is not suggestive, then no procedure is suggestive."). A first-time in-court identification is effectively a "show-up"-the witness is confronted with a single potential suspect and asked if he or she is the right one. But in-court identifications are in fact more suggestive than show-ups. A show-up might happen quite soon after a crime, at a time when the police are still investigating and might not yet have settled on a suspect. An in-court identification, by contrast, presents a witness with the single person who the police and the prosecutor believe committed the crime and typically does so long after the commission of the crime.
¶82 Second, the chances of mistake in a first-time in-court identification are at least as likely and the consequences of the mistake are the same-a wrongful conviction. See Hill , 967 F.2d at 232 ("The due process concerns are identical in both cases and any attempt to draw a line based on the time the allegedly suggestive identification technique takes place seems arbitrary. All of the concerns that underlie the Biggers analysis, including the degree of suggestiveness, the chance of mistake, and the threat to due process are no less applicable when the identification takes place for the first time at trial.").
¶83 And finally, first-time in-court identification, like impermissibly suggestive pretrial identifications, involves the state action that Perry explained was necessary to raise due process concerns. In pretrial identifications, the law enforcement arm whose misconduct might be deterred by the Biggers screening requirement is the police. When a prosecutor-another arm of law enforcement-is considering asking for a first-time in-court identification, requiring a judicial screening will deter that prosecutor from simply gambling that the courtroom setting will produce the desired identification. As the Connecticut Supreme Court recognized in prohibiting in-court identifications that were not preceded by an appropriate pretrial identification, "the rationale for the rule excluding identifications that are the result of unnecessarily suggestive procedures-deterrence of improper conduct by a state actor-applies equally to prosecutors." Dickson , 141 A.3d at 824.[2]
¶84 A first-time in-court identification will only occur when a witness has either not had an opportunity to identify the defendant before trial or, as happened here, has failed to identify the defendant when given the opportunity. In either case, the prosecution should be required to explain why it believes the in-court identification will be sufficiently reliable to avoid the irreparable harm of a mistake caused by the suggestive setting.
C.
¶85 For these reasons, I believe that a first-time in-court identification requires pretrial screening applying the factors set forth in Biggers .[3] If the trial court had conducted that screening here, it is unlikely that the three brothers would have been permitted to identify Mr. Garner for the first time from the witness stand. Biggers requires a court to consider
the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, *1125 the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation[,]
and to assess the reliability of an identification. 409 U.S. at 199-200, 93 S.Ct. 375. Considering each of those factors here, the likely reliability of the brothers' in-court identifications was extremely low.
¶86 As described by many witnesses in attendance, the shooting occurred in a very short period of time, during which the three brothers were scared for themselves and for each other. They had very little time to view who was shooting and each of them testified that their attention during that time was not on the shooter's face. Substantial scientific evidence shows that "eyewitness memory for persons encountered during events that are ... highly stressful ... may be subject to substantial error." Henderson , 27 A.3d at 904 (quoting Charles A. Morgan III et al., Accuracy of Eyewitness Memory for Persons Encountered During Exposure to Highly Intense Stress , 27 Int'l J.L. & Psychiatry 265, 274 (2004)); see also Lawson , 291 P.3d at 700-01. Moreover, as we have previously acknowledged, "recognition accuracy [is] poorer when the perpetrator [holds] a weapon." Bernal v. People , 44 P.3d 184, 190 (Colo. 2002) (quoting Vaughn Tooley et al., Facial Recognition: Weapon Effect and Attentional Focus , 17 J. of Applied Soc. Psychology 845, 854 (1987)).
¶87 The passage of time between the crime and the confrontation was significant; the shooting occurred three full years before the trial. Research demonstrates that "the more time that passes, the greater the possibility that a witness' memory of a perpetrator will weaken." Henderson , 27 A.3d at 907.
¶88 The three brothers offered wildly varying descriptions of the shooter over the course of the investigation. Initially, one described him as a young, bald man with the word "north" tattooed on his head. Another described him as a Hispanic man with short black hair. Later, two of the brothers said the shooter had both a mustache and a soul patch. Each of the brothers also gave differing descriptions of the shooter's clothes-one said he wore a bandana, another said jeans and tennis shoes, and the third said a dark shirt. Of these various items of clothing, the only one that Mr. Garner was wearing that night was a dark shirt.
¶89 If the court had screened for reliability before trial, the only evidence it would have had that would go to the brothers' "level of certainty" would be the fact that none of the three was able to identify Mr. Garner in a photo array as the person who shot at them that night, notwithstanding their later courtroom assertions of certainty and that they would never forget Mr. Garner's face. In fact, one of the brothers specifically said that Mr. Garner had been in the bar but that he was not the shooter. The brothers had no certainty at all before walking into the courtroom about their ability to identify Mr. Garner as the shooter.[4]
¶90 Given these facts, a pretrial screening for reliability quite likely would have led the court to conclude that the brothers' first-time in-court identifications lacked any likelihood of reliability and prevented a very high risk of the irreparable mistaken identification that due process protects against. Mr. Garner may or may not have committed the crime for which he was convicted. The process by which he was convicted was fundamentally unfair. Our Constitution requires more.
¶91 I respectfully dissent. I am authorized to state that JUSTICE HOOD and JUSTICE GABRIEL join in this dissent.

I appreciate that the trial judge may not always know if the prosecution intends a first-time, one-on-one identification of the defendant at trial. In the ordinary course, defense counsel should request a pre-trial hearing when there seems to be the potential for such an identification procedure. If defense counsel is uncertain of the prosecution's intentions in this regard, she may request an order for discretionary disclosure to the defense by the prosecution under Crim. P. 16 (I)(d)(1). The trial court may also institute a standard procedure requiring the prosecution to disclose to the court and defense counsel if she intends to attempt such an identification at trial. See C.R.E. 104(a) ("Preliminary questions concerning the qualification of a person to be a witness ... or the admissibility of evidence shall be determined by the court...."); C.R.E. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...."); C.R.E. 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter."); C.R.E. 611(a) ("The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth...."). Indeed, there is nothing about the court's holding today that prevents trial courts from imposing such restrictions on the admission of evidence, irrespective of the majority's conclusion today regarding what due process requires. Just because a court need not hold a pretrial hearing as a matter of constitutional law does not mean that a court should not hold such a hearing under the rules of evidence. Cf. C.R.E. 102 (The rules of evidence "shall be construed to secure fairness in administration ... and promotion of growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined.")

The rule adopted by both the Connecticut and the Massachusetts courts-that an in-court identification must be preceded by an appropriate pretrial identification-has much to recommend it and may one day be recognized as required by due process. Cognizant of concerns about a state supreme court's authority to adopt prophylactic rules under the federal Constitution, I confine myself here to the application of the Supreme Court's established test for screening eyewitness identifications procured through unnecessarily suggestive state action.

I agree with the majority that requiring this screening only for in-court identifications that are preceded by a failure to identify could disincentivize the police to use appropriate pretrial identification procedures. And I believe that the conduct that application of the Biggers screen would seek to deter in this context is any use of first-time in-court identifications. Of course, the brothers' failure to identify Mr. Garner in a photo line-up is something the court would consider as part of the screening process.

While the brothers' testimony from the stand reflected an extremely high level of certainty, certainty and accuracy do not have a high level of correlation. See, e.g. , Neil Brewer, et al., The Confidence-Accuracy Relationship in Eyewitness Identification , 8 J. Experimental Psychol. Applied 44, 44-45 (2002) ("[T]he outcomes of empirical studies, reviews, and meta-analyses have converged on the conclusion that the confidence-accuracy relationship for eyewitness identification is weak...."). For that reason, many states have replaced the "certainty" factor in the Biggers analysis. See, e.g. , State v. Herrera , 187 N.J. 493, 902 A.2d 177, 186 (2006) ; Brodes v. State , 279 Ga. 435, 614 S.E.2d 766, 771 (2005).