SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**State v. Roberson Burney** (A-14-22) (086966)

**Argued March 27, 2023 -- Decided August 2, 2023**

**PIERRE-LOUIS, J., writing for the Court.**

In this appeal, the Court considers whether it was cumulative error for the trial court to admit two pieces of evidence: expert testimony that defendant Roberson Burney's cell phone was likely near a crime scene based on a "rule of thumb" approximation for cell tower ranges in the area, and a first-time in-court identification of defendant by a witness who had previously identified another person as the perpetrator in a photo lineup.

On December 25, 2015, Rosette Martinez was at home with her daughter, Samantha, and Samantha's friend, when she heard footsteps coming up the stairs. She testified that a man opened the door and stated, "I'm here for your dad, George," leading her to believe he was there to fix something at the house. Martinez believed she recognized the intruder as someone who had recently done contracting work on their house. He then pulled out a "long gun," instructed the women to lay face down, tied their hands behind their backs, and began to rifle through possessions. At some point during the robbery, the women heard the intruder's phone ring and announce a "[c]all from" a name. Samantha testified that she heard the intruder's phone announce an "incoming text" message from a name she did not recognize, but the message was not read aloud. All three women testified that they heard clicking noises that indicated to them that the intruder was taking pictures with his phone. After the intruder left, the women untied themselves and called 911 at approximately 8:15 p.m.

The victims described the intruder and his clothes to the police. A detective spoke to Rosette's parents; they provided the name and business card of the contractor, Mark Burney, who had worked on their house a few weeks prior to the robbery. Mark Burney is defendant's brother, and he stated that defendant had been working with him at Rosette Martinez's home.

On December 26, Rosette Martinez misidentified a filler photo in a photo array with 90 percent certainty. She declined to make an identification during a second photo array, which included a photo of defendant, on December 28.

1

The day after the robbery, Martinez noticed that among the bags in the stairway to her apartment, there was a Costco bag she did not recognize. That bag was later found to have defendant's DNA on it.

On December 29, police visited defendant. While questioning him, a detective sent a text message to defendant's phone, which gave an audible voice announcement of a "text message received" from the detective's phone number and read the message out loud. The detective then obtained a warrant and arrested defendant. Police collected his clothing, which matched the victims' description. Defendant's cell phone records showed that he received a text message while the robbery was in progress. Additionally, defendant's phone included several blurry, dark pictures taken at 8:03 p.m. on December 25. Police also found several photographs of a "Princess" brand watch on defendant's cell phone captured in the days after the robbery, and four web searches for "Princess" watches.

On January 21, 2016, Martinez returned to the police station. A detective told her that defendant had been arrested for the robbery and that police seized his cell phone, which contained pictures of jewelry and a watch. The detective showed her one of the pictures of the watch, and she identified it as hers. She later provided the box for the watch, containing additional watch bands, to prove the watch was hers.

Defendant was indicted on several counts. Prior to trial, defense counsel moved to exclude testimony by the State's expert, Federal Bureau of Investigation Special Agent Ajit David, and any first-time in-court identification of defendant by any of the victims. The trial court denied both motions.

At trial, Rosette Martinez identified defendant as the intruder for the first time, pointing him out in the courtroom. And Special Agent David gave his expert opinion that the cell towers in the area had an approximate coverage radius of about one mile -- an estimate that reflected his "rule of thumb" for the area, which he stated was a "good approximation" based on his training and experience. Based on that "rule of thumb," he placed defendant's cell phone at or near the crime scene at the time of the robbery, emphasizing that it was "highly, highly unlike[ly]" that a cell tower defendant's phone had pinged at 8:02 p.m. did not cover the crime scene. Defendant was convicted of robbery and other offenses.

The Appellate Division affirmed as to both Special Agent David's testimony and the first-time in-court identification. 471 N.J. Super. 297, 304-05 (App. Div. 2022). The Court granted certification. 252 N.J. 134 (2022).

**HELD:** The trial court erred in admitting both the testimony placing defendant's phone at or near the crime scene and the first-time in-court identification. Those errors, in combination, deprived defendant of a fair trial.

2

1. Across the nation, state and federal courts have accepted expert testimony about cell site analysis for the purpose of placing a cell phone within a "general area" at a particular time. Unlike the more precise location data provided by a Global Positioning System (GPS), cell site analysis simply confirms that the phone was somewhere within the coverage radius of the cell tower during the recorded activity. The Seventh Circuit, concerned that a "jury may overestimate the quality of the information provided by" cell site analysis, has admonished that "[t]he admission of historical cell-site evidence that overpromises on the technique's precision -- or fails to account adequately for its potential flaws -- may well be an abuse of discretion." United States v. Hill, 818 F.3d 289, 299 (7th Cir. 2016). Under New Jersey case law, when an expert grounds testimony in personal views, rather than objective facts, the net opinion rule requires the exclusion of such unsupported views. In circumstances similar to this case, the Northern District of Illinois held that the testifying expert's estimates of the ranges of different cell towers were unreliable because they were based solely on the expert's training and experience. United States v. Evans, 892 F. Supp. 2d 949, 956 (N.D. Ill. 2012). (pp. 27-31)

2. Special Agent David testified that a one-mile radius was a "good approximation" as to the coverage area for the relevant cell tower. He did not testify that such approximation is common practice in cell tower analysis. And he candidly admitted that he did not consider any of the factors that can affect coverage listed in the Court's opinion. By Special Agent David's own admission, he determined the tower range "just based on [his] training and experience." And the State offered no outside evidence to support the range. That "rule of thumb" testimony constitutes an improper net opinion because it was unsupported by any factual evidence or other data. The Court does not suggest that, to be admissible, expert testimony must consider all of the factors listed. However, the testimony here was based on nothing more than personal experience, and the trial court erred in allowing it. (pp. 31-33)

3. The admissibility of Rosette Martinez's first-time in-court identification is controlled by the Court's holding today in State v. Watson, ___ N.J. ___ (2023). Although the dictates of Watson were not in effect at the time of the present trial, "[w]ith or without the benefit" of the ruling in Watson, "the nature of the identification in this case raises concerns." See id. at ___ (slip op. at 33). The identification procedure here was highly suggestive. By telling Martinez defendant's name, informing her that he had been arrested for the robbery, and showing her pictures of the watch found on his phone, the detective impermissibly influenced and tainted any future identification by her. Additionally, the layout of the courtroom, as Martinez admitted, tipped her off as to where defendant was seated. Furthermore, there was no "good reason" to allow the first-time in-court identification here. Martinez did not know defendant well prior to the robbery, see id. at ___ (slip op. at 29-30), and she was unable to identify defendant -- and indeed identified a different person in a filler photograph with 90 percent certainty -- when

3

she viewed the photo arrays.  There was no basis for an in-court identification under the circumstances.  In <u>Watson</u>, the Court directed that prosecutors must disclose "anything discussed with a witness during trial preparation that relates to an upcoming in-court identification" under <u>Rule</u> 3:11.  <u>Id.</u> at ___ (slip op. at 31).  Because comments like those made in this case about the defendant's identity and evidence that purportedly links the defendant to the crime could well make an in-court identification highly suggestive, the Court directs that such information be disclosed under <u>Rule</u> 3:11 as well.  The Court also explains that, in situations like what occurred here, the State must complete a photo display witness statement form.  The circumstances of Rosette Martinez's in-court identification were highly suggestive, and therefore, the identification should have been excluded.  (pp. 33-38)

4.  An appellate court may reverse a trial court's judgment if the cumulative effect of a series of errors is so great as to deprive a defendant of a fair trial.  Here, the trial court allowed the jury to hear two significant pieces of unreliable evidence that purportedly connected defendant to the robbery:  Special Agent David's testimony placing defendant's phone at or near the crime scene and Rosette Martinez's first-time in-court identification that defendant was the intruder.  The State stressed the credibility of both pieces of evidence in summation, and Martinez's testimony -- as the only witness who identified defendant as the intruder -- could have had a serious impact on the jury's perception of defendant's guilt or innocence in conjunction with Special Agent David's testimony.  The due process concerns raised by the likelihood of misidentification in Martinez's testimony magnify the harmfulness of the trial court's error.  Balancing the other evidence presented by the State against the force of the improperly admitted evidence, the Court finds that the cumulative error impacted and prejudiced the fairness of defendant's trial.  Therefore, defendant's conviction and sentence must be vacated and a new trial granted.  At a retrial, the State may not ask Rosette Martinez to identify defendant again.  (pp. 38-41)

**REVERSED and REMANDED for a new trial.**

**JUSTICE SOLOMON, dissenting,** agrees that the trial court erred in admitting the disputed testimony by Special Agent David and Rosette Martinez's first-time in court-identification but expresses the view that those errors are harmless in light of the sheer volume of competent evidence against defendant -- most notably his DNA on the Costco shopping bag found at the scene, the photographs of Martinez's unique watch on his phone, and the corresponding testimony about the intruder's text message alerts and the taking of photographs.

**CHIEF JUSTICE RABNER; JUSTICES WAINER APTER and FASCIALE; and JUDGE SABATINO (temporarily assigned) join in JUSTICE PIERRE-LOUIS's opinion.  JUSTICE SOLOMON filed a dissent, in which JUSTICE PATTERSON joins.**

SUPREME COURT OF NEW JERSEY

A-14 September Term 2022

086966

State of New Jersey,

Plaintiff-Respondent,

v.

Roberson Burney, a/k/a Robert
Burney, John Burney, Robin Burney, and
Michael Langford,

Defendant-Appellant.

On certification to the Superior Court,
Appellate Division, whose opinion is reported at
471 N.J. Super. 297 (App. Div. 2022).

| Argued | Decided |
|---|---|
| March 27, 2023 | August 2, 2023 |

Cody T. Mason, Deputy Public Defender II, argued the
cause for appellant (Joseph E. Krakora, Public Defender,
attorney; Cody T. Mason, of counsel and on the briefs,
and Stephen W. Kirsch, Designated Counsel, on the
briefs).

Lucille M. Rosano, Special Deputy Attorney
General/Acting Assistant Prosecutor, argued the cause for
respondent (Theodore N. Stephens, II, Acting Essex
County Prosecutor, attorney; Lucille M. Rosano, of
counsel and on the briefs).

Ethan Kisch argued the cause for amici curiae American
Civil Liberties Union of New Jersey, Association of

1

Criminal Defense Lawyers of New Jersey, and The
Innocence Project, Inc. (Gibbons, attorneys; Ethan Kisch
and Lawrence S. Lustberg, on the brief).

Lauren Bonfiglio, Deputy Attorney General, argued the
cause for amicus curiae Attorney General of New Jersey
(Matthew J. Platkin, Attorney General, attorney; Lauren
Bonfiglio, of counsel and on the brief).

JUSTICE PIERRE-LOUIS delivered the opinion of the Court.

In this appeal, we must determine whether it was cumulative error for the trial court to admit two pieces of evidence: expert testimony that defendant's cell phone was likely near a crime scene based on a "rule of thumb" approximation for cell tower ranges in the area, and a first-time in-court identification of defendant by a witness who had previously identified another person as the perpetrator in a photo lineup.

Defendant Roberson Burney was convicted of robbery and assault, among other charges, and sentenced to an extended term of life imprisonment without parole. The charges stemmed from an armed robbery at Rosette Martinez's home. In the days immediately following the home invasion, Rosette[1] was shown two photo arrays, the second of which included a photo of defendant. Rosette misidentified a filler photo in the first photo array with 90

---

[1] Because multiple witnesses and victims share the same surname, we use their first names to avoid confusion. We intend no disrespect in doing so.

2

percent certainty and declined to make an identification during the second photo array. One month later, detectives invited Rosette back to the police station and informed her that they had arrested defendant for the robbery of her home.

At trial, the State's expert, Federal Bureau of Investigation (FBI) Special Agent Ajit David, used defendant's cell phone records to create maps showing the cell towers with which defendant's phone made contact on the night of the robbery. Special Agent David gave his expert opinion that the cell towers in the area had an approximate coverage range with a radius of about one mile. That estimated radius was based solely on Special Agent David's "rule of thumb" for the area -- a "good approximation" based on his training and experience. Special Agent David relied on that approximation to place defendant's cell phone at or near the crime scene at the time of the robbery.

Prior to trial, defense counsel moved to exclude both Special Agent David's expert testimony and any first-time in-court identification of defendant by any of the victims. Defense counsel argued that Special Agent David's one-mile approximation was unreliable because it was based on nothing more than his personal experience. Defense counsel further argued that any in-court identification by Rosette was tainted by the detectives' highly suggestive conduct of telling Rosette defendant's name and sharing other

3

details of the investigation. The trial court denied both motions, thereby allowing Special Agent David to testify as to his one-mile approximation and Rosette to identify defendant as the intruder for the first time at trial.

The Appellate Division affirmed on both issues, holding that the trial court did not abuse its discretion in permitting Special Agent David's expert testimony or Rosette's first-time in-court identification. The court found that Special Agent David's estimated one-mile coverage range was well supported by his knowledge, skill, experience, and training. And although the Appellate Division noted that it was suggestive for police to tell Rosette defendant's name prior to her in-court identification, the court concluded that any weakness in the identification was "fully presented to the jury through skillful cross-examination" and adequate jury instructions.

For the reasons stated below, we find that the trial court erred in admitting both pieces of evidence. Those errors, in combination, deprived defendant of a fair trial. We therefore reverse and remand this matter for a new trial.

I.

A.

We rely on the testimony elicited at trial for the following summary.

4

On the evening of December 25, 2015, an armed robbery occurred at Rosette's two-family home in Bloomfield.  Rosette was with her daughter, Samantha, and Samantha's friend, Taffy Camacho, when she heard footsteps coming up the stairs to her door.  Rosette testified that a man opened the door and stated, "I'm here for your dad, George," leading her to believe he was there to fix something at the house.  Rosette believed she recognized the intruder as someone who had recently done contracting work on their house.  He then pulled out a "long gun" and ordered the women down the hall into Rosette's bedroom, following behind them.

The intruder instructed the women to lay face down and tied their hands behind their backs with telephone cords and scarves.  He asked where the money and gold were, and Rosette responded that she "d[id]n't have anything."  The man then began rifling through Rosette's drawers, jewelry, and pocketbooks.  Throughout the duration of the robbery, the man ordered: "[h]eads down," "eyes down," "don't look at me," and "shut up."

At some point during the robbery, the women heard the intruder's phone go off.  Rosette heard the intruder's phone ring and announce a "[c]all from" a name she did not recognize.  Thereafter, Rosette testified that the intruder "talk[ed] to somebody."  Samantha testified that she heard the intruder's phone announce an "incoming text" message from a name she did not recognize, but

5

the message was not read aloud. Samantha also testified that the intruder answered a call at one point. Camacho testified that she heard the intruder's phone announce an "incoming message." All three women testified that they heard clicking noises that indicated to them that the intruder was taking pictures with his phone.

After approximately fifteen to twenty minutes, the intruder told the women to give him a few minutes to leave, and no one would get hurt. After the women heard the intruder walk down the steps to the porch and leave, they untied themselves and called 911 at approximately 8:15 p.m.

Officers Leonard Antinozzi and Anna Ruiz of the Bloomfield Police Department responded to the 911 call and spoke with the victims, as well as Rosette's parents, who lived on the first floor. Rosette's parents did not see or hear anything related to the robbery. The victims described the intruder as a 5'8" to 5'9" tall, slender, Black man between the ages of forty and sixty. Rosette and Samantha recalled that the man wore a black beanie and dark clothes, and that his face was uncovered. Rosette reported that the intruder stole jewelry, two Amazon Kindles, and credit cards.

During the 911 call, Rosette told the dispatcher that the man "worked at our house," and told Officer Antinozzi the same. Rosette initially told Officer Antinozzi that upon entering the house, the intruder said, "I'm here to do work

6

on the house." In her formal statement to Bloomfield Police Detective Jeffrey Alfonso on the evening of the robbery, Rosette reported that the intruder told her "I am here to fix something for your father," who had hired the contractors. Rosette later testified that the intruder "said he's from Tyrone" -- her father's caretaker who referred the contractors to him. Samantha testified that the intruder said that he "knew Tyrone, and he was [there] for my grandpa or something like that." Camacho recalled the intruder saying something about "plumbing."

After taking the victims' statements, Detective Alfonso re-canvassed the scene and spoke to Rosette's parents. They provided the name and business card of the contractor, Mark Burney, who had worked on their house a few weeks prior to the robbery. Mark has five brothers: defendant, John, Cornelius, Tyrone,[2] and Christopher. Detective Alfonso contacted Mark, who told the detective that defendant had been working with him at Rosette's home.

Rosette testified that she had seen defendant on two prior occasions. Rosette stated that her father hired Mark in October or November 2015 to repair their porch roof, and defendant had assisted his brother by cleaning the porch windows. Mark's son had also assisted with the work at Rosette's

---

[2] There are two individuals in this matter named Tyrone, Tyrone Burney and Tyrone the caretaker.

house. Rosette testified that she briefly spoke to defendant when she handed him some cleaning supplies. And Rosette testified that a few weeks before the robbery, defendant rang her doorbell and asked if her father was home. Rosette responded that her parents were not home and to come back later.

On December 26, police showed Rosette a photo array that included a photo of defendant's brother Cornelius. Rosette identified a "filler" photo (a photo of a person unrelated to the investigation) with "at least 90" percent certainty. On December 28, police showed Rosette a second array, which included a photograph of defendant. Rosette declined to choose a photograph in that array. Specifically with regard to defendant, Rosette did not select his photograph -- number five in the array -- stating, "that's not his nose." As the photo array concluded, Rosette asked detectives about "the other picture the other day" that she identified.

Police also showed Samantha two photo arrays, neither of which included a photograph of defendant. The first photo array included a photo of Cornelius, and Samantha declined to make an identification. The second photo array included a photo of Tyrone Burney, and Samantha identified a filler photo. Camacho was also shown the array with a photo of Tyrone Burney, and she similarly identified a filler photo with 80 percent certainty.

8

The day after the robbery, Rosette noticed that among the bags in the stairway to her apartment, there was a Costco bag she did not recognize. Detective Alfonso returned to the residence to collect the evidence, which was later tested. The Costco bag was found to have defendant's DNA on it. The bag appeared in a photograph taken by the Crime Scene Unit on the date of the crime, but no witness could testify as to how long it had been on the stairway.

On December 29, Bloomfield police detectives visited defendant at University Hospital in Newark. Detective Alfonso had obtained defendant's location and phone number from his brother Mark. Defendant was at the hospital receiving treatment unrelated to the offense. While questioning defendant, Detective Alfonso used his police-issued phone to send a text message, "hello," to defendant's phone. Defendant's phone gave an audible voice announcement of a "text message received" from Detective Alfonso's phone number, and it read the message out loud. Detective Alfonso testified that he sent the text message as a test based on Samantha's report that the intruder received a text message during the robbery and his phone announced the incoming text.

Detective Alfonso then obtained a telephonic arrest warrant and arrested defendant at the hospital. At the time of his arrest, defendant was 6'1", 198 pounds, and fifty-seven years old. Upon defendant's arrest, police collected

9

defendant's clothing -- a black knit wool hat, a winter jacket, and a maroon-colored jacket -- which matched the victims' description of the intruder's clothing.

After obtaining a communications data warrant and search warrant, police obtained defendant's cell phone records, which showed that defendant received a text message at 8:02 p.m. on December 25 while the robbery was in progress. The next "event" -- text message or phone call -- on defendant's phone did not occur until 8:22 p.m. that night. Additionally, defendant's phone included several blurry, dark pictures taken at 8:03 p.m. on December 25. Police also found several photographs of a "Princess" brand watch on defendant's cell phone captured in the days after the robbery between December 26 and December 29, and four web search results for "Princess" watches performed on December 26 and 28.

On January 21, 2016, Rosette returned to the police station. A detective told Rosette that defendant had been arrested for the robbery of her home and that police seized defendant's cell phone, which contained pictures of jewelry and a watch. The detective then showed Rosette one of the pictures of the watch, and she identified it as her watch. Rosette testified that her watch had a black band, clear rhinestones around it, and a "Princess" engraving on the

10

inside. Rosette later provided Detective Alfonso with the black box for the watch, containing additional watch bands, to prove that the watch was hers.

The police did not find usable fingerprints on any items known to be touched by the intruder. The items used to tie up the victims were collected but were not submitted for DNA analysis. The police never recovered any of the stolen items or the gun.

B.

On April 28, 2016, an Essex County grand jury charged defendant with first-degree robbery, second-degree burglary, fourth-degree aggravated assault, third-degree criminal restraint, third-degree unlawful possession of a weapon, second-degree possession of a weapon for an unlawful purpose, third-degree burglary, and third-degree theft.

Before trial, defendant moved to suppress his statements to police at University Hospital, arguing that the police interrogators failed to properly advise him of his Miranda[3] rights. The trial court agreed and suppressed defendant's statements from the State's case-in-chief; the court found, however, that because defendant's statements were made voluntarily, they

---

[3] Miranda v. Arizona, 384 U.S. 436 (1966).

could be used for impeachment purposes if defendant chose to testify at trial. Ultimately, defendant elected not to testify.

Defendant also moved to bar the State's expert witness, Special Agent David, a member of the FBI's Cellular Analysis Survey Team (CAST), from testifying that on December 25, 2015, at 8:02 p.m., defendant's phone "pinged," or was in contact with, a cell tower with an approximate one-mile coverage area that included the crime scene. Defendant argued that Special Agent David's testimony was unreliable because he presented no evidence to support his general "rule of thumb" that the pinged cell tower had an approximate one-mile coverage area.

On July 6, 2017, the court held a Frye[4] hearing to determine the admissibility of Special Agent David's testimony. Special Agent David was qualified as an expert in historical cell site analysis, which he explained "is the use of cell phone companies' business records to approximate[5] where a user may have been at a particular time of interest."

---

[4] Frye v. United States, 293 F. 1013 (D.C. Cir. 1923).

[5] According to Special Agent David's testimony, historical cell site analysis cannot pinpoint a cell phone user's exact or real-time location; rather, it is utilized to approximate the prior location of a device based on the cell towers the device used at the time.

Special Agent David testified at the Frye hearing that he obtained defendant's phone records from Sprint, which cataloged the date and time of calls and text messages, the cell towers and sectors[6] that the phone used, and the locations of those towers. Based on this information, Special Agent David created maps depicting the towers pinged by defendant's phone on the evening of December 25, and which sectors defendant's phone utilized. Special Agent David plotted the cell towers and drew two lines -- 120-degree pie-shaped wedges -- extending from each of the cell towers' pinged sectors. Critically, Special Agent David testified that each of the lines had an approximate length of one mile, with the space in between them representing his estimated coverage area of the cell tower's sector.

Special Agent David opined that the towers likely had this one-mile range based on a "rule of thumb" for towers in the area. When asked how he determined the length of the two lines or "arms" that comprised the 120-degree coverage area for the cell towers, he explained:

> So . . . the length that was used for these arms is, again, an estimate and these are one mile, which is a rule of thumb for this particular technology and this particular

---

[6] Special Agent David testified that typically, cell towers are divided into three sectors, with each sector covering around 120 degrees and overlapping slightly to prevent dropped calls. The particular sector a phone utilized generally reveals the cardinal direction the phone was oriented towards when it pinged the cell tower.

frequency in this particular area. So just based on my training and experience, <u>one mile is a good estimate of the tower range for Sprint in this area</u>. It's also further kind of supported by the location of the adjacent towers. We can infer, based on how the network is laid out and the fact that Sprint has designed this to avoid coverage gaps, that the tower needs to extend out to a certain distance that obviously doesn't cross over other towers, but that provides enough overlap between adjacent sectors so that there's no drops, no call drops, no dead zones in between. <u>So just using a one-mile approximation, which has been a good approximation in my experience in this area.</u>

With this foundation, Special Agent David testified that on December 25 at 8:02 p.m., defendant's phone used a tower in Orange, the "Parkway Tower," to receive a text message. Using his maps, Special Agent David gave his opinion that the Parkway Tower's coverage radius "would reasonably include the crime scene." Special Agent David acknowledged that the crime scene is slightly less than one mile from the Parkway Tower and is at the "outer boundary" of his estimated coverage area. Special Agent David also acknowledged, however, that two <u>other</u> cell towers were closer to, and within range of, the crime scene.[7]

---

[7] Earlier in the hearing, Special Agent David noted, "in an area like this part of Essex [County]," where the home invasion occurred, "which is relatively flat, [the strongest signal] will generally be the closest tower." Special Agent David did not map out the specific orientations of the cell towers' sectors closer to the crime scene, so he did not determine which cell tower had the "clearest[,] strongest signal." Special Agent David testified that "the cleanest

Special Agent David testified that he did not test the actual range of the Parkway Tower.  The agent further noted that a tower's range and coverage area can be affected by many factors, including the height of the antenna, surrounding terrain and buildings, signal frequency, transmitter and phone power ratings, and antenna direction, but he did not offer measurements or data as to those specific factors when testifying as to his estimated range for the Parkway Tower.  Special Agent David similarly did not measure the actual coverage area of the Parkway Tower through either "drive testing"[8] or "propagation maps."[9]

Defense counsel argued that Special Agent David's testimony regarding the range of the cell towers in question, and the Parkway Tower specifically, was not sufficiently reliable under Frye because Special Agent David used a "rule of thumb" and did not "look at the specific tower data for any of these

and clearest signal propagates from" the "azimuth of the cell site," that is, the direct center of the 120-degree wedge.

[8] "Drive testing" measures "the actual coverage area of a particular cell site" through use of "a scanner that scans all of the radio frequencies in a particular area."  Special Agent David testified that he had performed drive testing in the past.

[9] "Propagation maps" are used to estimate the range of a tower more precisely "based upon things like terrain, altitude, density of interference, [and the presence of] other towers."  Special Agent David testified that he had never calculated or created a propagation map.

15

towers" or review the Parkway Tower's height or power rating -- all factors the agent testified can affect the tower's range. Defense counsel argued that based on Special Agent David's "general one-mile rule of thumb," it is "entirely possible that the crime scene falls outside the range of [the Parkway Tower]."

The trial court admitted Special Agent David's testimony, concluding that cell site analysis testimony "is sufficiently reliable based upon its general acceptance by the courts and other jurisdictions." The court determined that Special Agent David's testimony was clear that he was only approximating the cell phone's location and not testifying as to its specific location. The court gave no independent consideration as to Special Agent David's methodology.

On November 22, 2017, defendant moved in limine to preclude the State from eliciting an in-court identification from any of the victims. Defendant argued that Rosette could not make a reliable identification because police had impermissibly tainted any future identification by showing her the photos of a Princess watch, telling her they were from defendant's phone, telling her defendant's name, and telling her that defendant had been arrested for the robbery. The trial court denied the motion, reasoning that defendant's concerns could be addressed through cross-examination and proper jury charges.

16

On February 7, 2018, the jury trial began. Prior to Rosette's testimony, defense counsel requested that a contemporaneous <u>Henderson</u>[10] charge be given to the jury, in the event that Rosette identified defendant in-court for the first time. The judge reserved his decision. At the end of her direct testimony, Rosette identified defendant as the intruder for the first time, pointing him out in the courtroom. Defense counsel immediately renewed the request for a <u>Henderson</u> charge to be given before cross-examination. The judge denied the request, but made the following announcement to the jury:

> Members of the [j]ury, before we start cross-examination what I just want to advise you is with regard to all matters that are before you, it's ultimately your determination of the evidence in the case. With regard to identification, I'm going to give you detailed instructions on various factors that you can consider and identification. As you heard testimony Ms. Martinez just identified the defendant in this case as being the one who perpetrated the crime and you've heard she previously viewed photographs where she wasn't able to make an identification. So with regard to the identification process and the various factors that you can consider, I'm going to give you detailed instructions about that at the conclusion of the case, all right?

On cross-examination, Rosette confirmed that she "concluded they arrested the right guy" after detectives showed her the photograph of the watch

---

[10] <u>State v. Henderson</u>, 208 N.J. 208 (2011).

from defendant's phone. She also testified that she knew defendant was the suspect based on where he was sitting in the courtroom.

Special Agent David's trial testimony was consistent with his pretrial testimony. He emphasized to the jury that it was "highly, highly unlike[ly]" that the Parkway Tower did not cover the crime scene based on the tower's approximated coverage distance. On cross-examination, Special Agent David testified for the first time that the Parkway Tower "is mounted on the top of a high-rise apartment building with a clear line of sight to [the crime scene]" -- but again did not provide measurements as to the height of the tower, nor did he provide data as to the other factors that could have influenced the estimated coverage area and range of the Parkway Tower.

After Special Agent David's trial testimony, defense counsel raised a separate objection, arguing that Special Agent David's one-mile "rule of thumb" opinion was an impermissible "net opinion" -- an opinion without an underlying justification. The court disagreed, finding that Special Agent David "gave an approximation based upon his training, expertise, and experience."

After the State rested, defense counsel proposed three additions to the model jury instruction on in-court identifications. The court offered a "compromise," and read the charge to the jury as follows:

The State has presented testimony of Rosette Martinez, who identified Roberson Burney. You will recall that this witness identified the defendant in court on February 12th, 2018 as the person who committed the crimes charged in the indictment.

. . . .

You may also consider that Rosette Martinez did not identify Roberson Burney during the photo array procedure that was conducted on December 28th, 2015.

The charge otherwise followed the model jury instruction.

On March 1, 2018, the jury acquitted defendant on the third-degree unlawful possession of a weapon charge and convicted him of the remaining charges. On August 31, 2018, defendant was sentenced to an extended term of life without parole pursuant to N.J.S.A. 2C:43-7.1 (the persistent offenders statute) on the first-degree robbery and second-degree possession charges, and concurrent terms on the remaining charges.

## C.

Defendant appealed his conviction, arguing that the trial court erred in permitting: (1) Special Agent David's expert testimony on the Parkway Tower's approximate one-mile coverage range; (2) Rosette's first-time in-court identification; and (3) defendant's hospital-bed statements for impeachment purposes. State v. Burney, 471 N.J. Super. 297, 304 (App. Div.

19

2022).  The Appellate Division affirmed defendant's conviction and sentence but remanded on the <u>Miranda</u> issue.  <u>Id.</u> at 304-05.

The Appellate Division held that the trial court did not abuse its discretion in permitting Special Agent David's expert testimony, reasoning that the "estimate of a one-mile range of coverage was well-supported by his knowledge, skill, experience, and training, as well as by the Relevant Locations maps included in his expert report."  <u>Id.</u> at 320.  The court determined that Special Agent David's maps "clearly indicate that most towers in that area were approximately one mile or further apart," so the one-mile range was therefore "well-supported by factual evidence in the record."  <u>Id.</u> at 322.  The court explained that "[i]t was for the jury to decide whether [Special Agent David's] testimony was credible and how much weight to give it."  <u>Id.</u> at 320.

The Appellate Division also held that the trial court did not abuse its discretion in allowing Rosette's first-time in-court identification.  <u>Id.</u> at 329-30.  First, the court asserted "[t]he record is clear that Rosette had interacted with defendant on two occasions prior to the robbery" and that she recognized defendant during the course of the robbery as someone who had done repair work on her house.  <u>Id.</u> at 329.  Based on those prior interactions, the court found that Rosette's identification could have been "based on an independent

recollection of defendant." Ibid. The appellate court next found that the officers' conduct -- telling Rosette defendant's name, informing her that he had been arrested for the robbery, and asking her to view photos extracted from his phone -- was suggestive and could have impacted her in-court identification, but it ultimately concluded that any unreliability in her identification was "fully presented to the jury through skillful cross-examination" and appropriate jury instructions. Id. at 329-30. Thus, the court held that defendant failed to meet the high standard required for suppression. Id. at 330.

The Appellate Division added that, alternatively, any theoretical error resulting from admitting Rosette's in-court identification was harmless in light "of the overwhelming evidence that defendant was the robber." Ibid. The court determined "that even if the in-court identification had been suppressed, Rosette would still have identified her watch from the photographs stored on defendant's cell phone."[11] Ibid.

---

[11] We note that the Appellate Division's decision incorrectly stated that the photos of the Princess watch found on defendant's phone were taken at the time of the robbery. The trial record makes clear that the pictures of the Princess watch were not taken the night of the robbery; rather, they were taken in the days after the robbery. The pictures found on defendant's phone taken on the night of the robbery were dark and blurry.

On the <u>Miranda</u> issue, which is not before this Court, the Appellate Division held that the trial court's findings, without the benefit of an expert medical witness, were inadequate to support its conclusion that defendant's hospital-bed statements were made voluntarily and thus could be used for impeachment purposes. <u>Id.</u> at 305, 316. The Appellate Division remanded for a new suppression hearing and directed the State to present expert testimony concerning defendant's medical condition at the time of the interrogation and the impact his medical condition had on the voluntariness of his statements to police. <u>Id.</u> at 318. If, on remand, the State failed to prove beyond a reasonable doubt that defendant's admissions were voluntary, the Appellate Division ordered that defendant's convictions be reversed, and he must be granted a new trial. <u>Id.</u> at 318-19.

We granted defendant's petition for certification on the issues unrelated to the remand. 252 N.J. 134 (2022). We also granted the joint application of the American Civil Liberties Union of New Jersey, the Association of Criminal Defense Lawyers of New Jersey, and the Innocence Project, Inc. (collectively, defense amici) and the application of the Attorney General to appear as amici curiae.

## II.

### A.

Defendant argues that the decisions of the trial court and the Appellate Division should be reversed because the trial court permitted the jury to hear two key pieces of unreliable evidence: (1) Special Agent David's expert testimony that the Parkway Tower's range would likely "include the crime scene" based on his one-mile "rule of thumb," and (2) Rosette's first-time in-court identification. Defendant contends those errors were clearly capable of affecting the jury's verdict because the State placed substantial weight on that unreliable evidence during trial.

Defendant argues the State failed to prove that Special Agent David's testimony has a clearly reliable scientific basis, particularly because the expert did not explain his methodology in arriving at the one-mile range. Defendant further argues that the agent's testimony, and the conclusions drawn from it, constitute an improper net opinion.

Defendant next argues that Rosette's in-court identification should have been excluded because it was the result of unduly suggestive procedures by the police and because Rosette did not have a sufficiently reliable basis for her identification independent of the detectives' suggestive conduct, given that her two prior interactions with defendant were very brief.

23

The defense amici support defendant's position and argue that both the cell tower and the identification testimony were improperly admitted, each requiring reversal. The defense amici submit that Special Agent David's one-mile "rule of thumb" range is unreliable because the State did not prove his approach is an accepted method in the relevant scientific community. The defense amici argue that Rosette's first-time in-court identification should have been excluded given the substantial likelihood that the detectives' highly suggestive out-of-court conduct would result in irreparable misidentification. Defense amici also ask this Court to apply the <u>Henderson</u> framework to this context to bar all first-time in-court identifications, arguing that such identifications are extremely suggestive and unreliable.

B.

The State argues that the decisions of the trial court and Appellate Division to admit the expert and identification testimony should be affirmed. The State contends that Special Agent David's expert testimony regarding the approximate one-mile range of the Parkway Tower is sufficiently reliable, and thus not an improper net opinion, because using cell site analysis to determine an approximate location of a cell phone is generally accepted in the scientific community and Special Agent David's opinion was based on his "training and expertise." Alternatively, the State argues that if there was error in admitting

24

this testimony, any "error was harmless considering the State's overwhelming evidence establishing defendant's presence in the house during the robbery."

The State also argues that Rosette's first-time in-court identification of defendant as the perpetrator was sufficiently reliable because she had two prior face-to-face interactions with defendant shortly before the robbery. The State asserts that defendant's allegation of suggestiveness fails to meet the high standard required for suppression.

The Attorney General echoes the State's arguments and asks this Court to affirm the Appellate Division's decision. The Attorney General adds that most in-court identifications should be admitted because instances of suggestiveness can be effectively addressed by cross-examination and proper jury instructions, as was done here.

III.

A.

Appellate courts generally "defer to a trial court's evidentiary ruling absent an abuse of discretion." State v. Garcia, 245 N.J. 412, 430 (2021). "A court abuses its discretion when its 'decision is made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" State v. Chavies, 247 N.J. 245, 257 (2021) (quoting State v. R.Y., 242 N.J. 48, 65 (2020) (internal quotation omitted)). "[A]

25

functional approach to abuse of discretion examines whether there are good reasons for an appellate court to defer to the particular decision at issue." R.Y., 242 N.J. at 65 (alteration in original) (quoting Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002)).

The abuse of discretion standard governs the evidentiary issues before us, which we will consider in turn. See Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 371 (2011) (reviewing admissibility of expert testimony on net opinion grounds for abuse of discretion).

## B.

We first address whether the trial court erred in permitting Special Agent David to testify that the Parkway Tower had an approximate one-mile coverage radius based on a "rule of thumb" for towers in the area.

### 1.

We briefly discuss the manner in which cell phones function and the relationship between cell phones, cell towers, and cell site analysis. Basic cell phones "operate[] like a scanning radio" and "use radio waves to communicate between a user's handset and a telephone network." State v. Earls, 214 N.J. 564, 576 (2013). "To connect with the local telephone network, the Internet, or other wireless networks, cell-phone providers maintain an extensive network of cell sites, or radio base stations, in the geographic areas they

26

serve." Ibid. When a cell phone user places a call or sends a text message, the phone generally "connects to the cell site with the strongest signal." Aaron Blank, The Limitations and Admissibility of Using Historical Cellular Site Data to Track the Location of a Cellular Phone, 18 Rich. J.L. & Tech. 3, 6 (2011). The proximity of the user to the cell site is a significant factor in determining which cell tower has the strongest signal; however, other relevant "factors include the towers' technical aspects, including geography and topography, the angle, number, and directions of the antennas on the sites, the technical characteristics of the relevant phone, and 'environmental and geographical factors.'" United States v. Hill, 818 F.3d 289, 295-96 (7th Cir. 2016) (quoting Blank, 18 Rich. J.L. & Tech. at 5, 7).

"Historical cell-site analysis uses cell phone records and cell tower locations to determine, within some range of error, a cell phone's location at a particular time." Id. at 295. Across the nation, state and federal courts have accepted expert testimony about cell site analysis for the purpose of placing a cell phone within a "general area" at a particular time. See, e.g., id. at 298; United States v. Baker, 58 F.4th 1109, 1125 (9th Cir. 2023); United States v. Jones, 918 F. Supp. 2d 1, 4 (D.D.C. 2013); United States v. Medley, 312 F. Supp. 3d 493, 499-502 (D. Md. 2018), aff'd 34 F.4th 326, 337-38 (4th Cir. 2022); Holbrook v. Commonwealth, 525 S.W.3d 73, 80-82 (Ky. 2017). Unlike

27

the more precise location data provided by a Global Positioning System (GPS), cell site analysis simply confirms that the phone was somewhere within the coverage radius of the cell tower during the recorded activity. See James Beck et al., The Use of Global Positioning (GPS) and Cell Tower Evidence to Establish a Person's Location -- Part II, 49 Crim. L. Bull. 637 (2013).

In Hill, the Seventh Circuit, concerned that a "jury may overestimate the quality of the information provided by" cell site analysis, admonished that "[t]he admission of historical cell-site evidence that overpromises on the technique's precision -- or fails to account adequately for its potential flaws -- may well be an abuse of discretion." 818 F.3d at 299. In that case, the testifying expert used cell site analysis to trace the whereabouts of the defendant's phone over the span of two days, with the implication that the phone was in the general area of the Credit Union the day it was robbed. Id. at 297-98. The agent did not testify as to the cell tower's specific range, and he admitted on cross that he did not know any of the particular characteristics of the tower. Id. at 298. The Seventh Circuit found that because the agent "emphasized that [the defendant]'s cell phone's use of a cell site did not mean that [the defendant] was right at that tower or at any particular spot near that tower," "[t]his disclaimer saves his testimony" that the phone was in the general area of the cell site. Ibid.

28

2.

N.J.R.E. 702 and N.J.R.E. 703 govern the admissibility of expert testimony. Townsend v. Pierre, 221 N.J. 36, 53 (2015).

> Expert testimony must be offered by one who is "qualified as an expert by knowledge, skill, experience, training, or education" to offer a "scientific, technical, or . . . specialized" opinion that will assist the trier of fact, see N.J.R.E. 702, and the opinion must be based on facts or data of the type identified by and found acceptable under N.J.R.E. 703.
>
> [Pomerantz Paper Corp., 207 N.J. at 372 (omission in original).]

"[A] court must ensure that the proffered expert does not offer a mere net opinion." Ibid. The net opinion rule, a corollary of N.J.R.E. 703, "forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data." Townsend, 221 N.J. at 53-54 (quoting Polzo v. County of Essex, 196 N.J. 569, 583 (2008)). "The rule requires that an expert 'give the why and wherefore' that supports the opinion, 'rather than a mere conclusion.'" Id. at 54 (quoting Borough of Saddle River v. 66 E. Allendale, LLC, 216 N.J. 115, 144 (2013)); see also Pomerantz Paper Corp., 207 N.J. at 372.

This Court has previously held that when an expert grounds testimony in personal views, rather than objective facts, the net opinion rule requires the

29

exclusion of such unsupported views.  Pomerantz Paper Corp., 207 N.J. at 372-74; see also Alpine Country Club v. Borough of Demarest, 354 N.J. Super. 387, 395-96 (App. Div. 2002) (rejecting an expert's personal "rule of thumb" approach to fair market value).  In Pomerantz Paper Corp., we concluded that although the expert "opined at some length about his experiences and his impressions" at trial, his essential testimony as to "acceptable markups in sales" was based on his personal views.  207 N.J. at 373-74.  We found that, because his testimony "lack[ed] any suggestion about the expert's support for the conclusions that he intended to offer," the trial court erred in permitting the expert to testify.  Ibid.; see also Townsend, 221 N.J. at 57 (holding an expert's testimony was inadmissible net opinion, noting the expert "took no measurements" and "did not apply his engineering expertise to present empirical evidence" supporting his contentions).

Under circumstances more similar to the case before us, the Northern District of Illinois held that the testifying expert's estimates of the ranges of different cell towers were unreliable because they were based solely on the expert's training and experience.  United States v. Evans, 892 F. Supp. 2d 949, 956 (N.D. Ill. 2012).  The court determined that "[e]stimating the coverage area of radio frequency waves [of a cell tower] requires more than just training and experience, . . . it requires scientific calculations that take into account

30

factors that can affect coverage." Ibid. Because the expert in that case "presented no scientific calculations," "did not consider a variety of relevant factors," and did not have his methodology assessed by the relevant scientific community, the court found the expert testimony inadmissible. Id. at 956-57.

3.

In the present case, defendant maintains that the State failed to prove Special Agent David's "rule of thumb" opinion is reliable and argues it is therefore an improper net opinion. Defendant does not challenge all forms of cell site analysis, nor does he challenge Special Agent David's qualifications. Rather, defendant asserts that Special Agent David failed to offer factual evidence or data to support his conclusion that the Parkway Tower has an approximate coverage area of one mile, which just barely places Rosette's home within the tower's estimated range.

At trial, Special Agent David testified that, based on his training and experience, a one-mile radius for the Parkway Tower was a "good approximation" as to its coverage area. Special Agent David did not testify that such approximation is common practice in cell tower analysis, or that his one-mile "rule of thumb" had been used by any other agent or radio frequency engineer. Additionally, Special Agent David candidly admitted that he did not review the height of the Parkway Tower, did not review its rated power, did

not calculate the estimated absorption of radio energy by nearby buildings or hills, did not review the specific angle of the tower's antenna, and did not review any diagnostic data from the tower on December 25. Special Agent David similarly did not perform any tests of the Parkway Tower's area of signal coverage. By Special Agent David's own admission, he determined the tower range "just based on [his] training and experience." And the State offered no outside evidence to support the range of the Parkway Tower.

With his rule of thumb, Special Agent David created a map to illustrate the coverage area for the Parkway Tower. When asked on cross-examination whether it was possible that Rosette's home could fall outside the Parkway Tower's actual coverage area, Special Agent David responded that though possible, it was "highly, highly unlike[ly]." Given the lack of data to support the agent's approximation of the cell tower's coverage area, Special Agent David's testimony failed to account adequately for the potential flaws in his "rule of thumb" opinion. See Hill, 818 F.3d at 299.

We agree with defendant that Special Agent David's "rule of thumb" testimony constitutes an improper net opinion because it was unsupported by any factual evidence or other data. We do not suggest that, to be admissible, expert testimony must consider all of the factors listed above. However, because the testimony was based on nothing more than Special Agent David's

32

personal experience, the trial court erred in allowing the jury to hear this testimony.

## C.

We now turn to the admissibility of Rosette's first-time in-court identification. Our holding today in State v. Watson, ___ N.J. ___ (2023) (slip op. at 1) controls in this matter.

In Watson, the witness, who previously misidentified another person's photograph as the perpetrator in a pretrial photo array, learned from the prosecutor prior to trial that the defendant was going to be seated at the defense table. Id. at ___ (slip op. at 7-8). At trial, the witness identified the defendant for the first time, in court, with 80 percent certainty. Id. at ___ (slip op. at 7).

In reversing defendant's conviction, we held that "first-time in-court identifications can be conducted only when there is 'good reason' for them," in order "[t]o avoid unduly suggestive identifications of defendants in court that may trigger serious due process concerns under the State Constitution." Id. at ___ (slip op. at 29). We delineated several examples that could constitute "good reasons" to permit a first-time in-court identification, including when an eyewitness is familiar with the defendant from before the crime occurred, when domestic violence victims seek to identify their assailants, when

"[f]riends or associates, among others," seek to identify a defendant that "they have known for some time," and when an officer, who arrested the individual, is called to confirm the defendant is that same person. Id. at ___ (slip op. at 29-30).

This Court held, however, that the better practice is for the State to conduct appropriate identification procedures prior to trial to avoid the unduly suggestive nature of in-court identifications. Id. at ___ (slip op. at 30). Additionally, "if a witness fails to make a positive identification at an earlier procedure, the State must show that the proposed, upcoming in-court identification would be more reliable and would 'pose[] little risk of misidentification despite its suggestiveness.'" Id. at ___ (slip op. at 30) (alteration in original) (quoting Commonwealth v. Collins, 21 N.E.3d 528, 536-37 (Mass. 2014)).

To ensure orderly proceedings, we outlined in Watson the required procedures for first-time in-court identifications going forward. Id. at ___ (slip op. at 30-31). First, "the State must file a motion in limine if it intends to conduct a first-time in-court identification," which will give the defendant advance notice and the opportunity to oppose the identification procedure prior to trial. Id. at ___ (slip op. at 30). At the hearing on the motion, the court will determine whether "good reason" exists to allow the first-time in-court

34

identification.  Id. at ___ (slip op. at 31).  Second, prosecutors must disclose in writing any comments made to a witness during trial preparation that potentially relate to the in-court identification, including whether prosecutors told the witness that the defendant would be in the courtroom or where the defendant would be seated.  Id. at ___ (slip op. at 31).  Lastly, any hearing on the admissibility of an in-court identification should be held and the issue should be resolved before the start of trial.  Id. at ___ (slip op. at 31).

In the present matter, one day after the crime occurred, Rosette misidentified a filler photograph with 90 percent certainty during the December 26 identification procedure.  Two days later, during the December 28 identification procedure -- in which Rosette reviewed an array that included a photograph of defendant -- she did not identify anyone.  On January 21, a detective told Rosette defendant's name; showed her photos of a watch she identified as hers and said that the photos were from defendant's phone; and informed her that defendant had been arrested for the robbery of her home.  On cross-examination at trial, Rosette even testified that she "concluded they arrested the right guy" after detectives showed her the photograph of the watch and she stated that she knew defendant was the suspect based on where he was sitting in the courtroom.

Although the dictates of <u>Watson</u> were not in effect at the time of the present trial, "[w]ith or without the benefit" of this Court's ruling in <u>Watson</u> today, "the nature of the identification in this case raises concerns." <u>See</u> <u>id.</u> at ___ (slip op. at 33). The identification procedure here was highly suggestive. By telling Rosette defendant's name, informing her that defendant had been arrested for the robbery, and showing her pictures of the watch found on defendant's phone, the detective impermissibly influenced and tainted any future identification by Rosette. Additionally, the layout of the courtroom, as Rosette admitted, tipped her off as to where defendant was seated in the courtroom.

Furthermore, there was no "good reason" to allow the first-time in-court identification here. Rosette did not know defendant well prior to the robbery. <u>See</u> <u>id.</u> at ___ (slip op. at 29-30). She testified that she briefly interacted with defendant on two prior occasions, and she was unable to identify defendant -- and indeed identified a different person in a filler photograph with 90 percent certainty -- when she viewed the photo arrays. There was no basis for an in-court identification under the circumstances.

For reasons unexplained in the record, a photo display witness statement form was not filled out regarding Rosette's misidentification. Based on the absence of a photo display form, the State and the Attorney General contend

36

that Rosette did not identify anyone in this photo array, notwithstanding her video-recorded statement during the photo lineup that she was 90 percent certain the perpetrator was the person in the filler photo. Their argument is unavailing; if Rosette had identified defendant -- instead of a filler photo -- with 90 percent certainty, the State would certainly treat that as an identification regardless of whether the photo display form was filled out. In situations like what occurred here, the State must complete a photo display form.

In this case, investigators revealed certain evidence to Rosette. In particular, they told her defendant's name and showed her photos from defendant's phone of a watch she said was hers. In <u>Watson</u>, we directed that prosecutors must disclose "anything discussed with a witness during trial preparation that relates to an upcoming in-court identification" -- for example, whether the defendant will be in the courtroom or where the defendant will be seated -- under <u>Rule</u> 3:11. <u>Id.</u> at ___ (slip op. at 31). Because comments about the defendant's identity and about evidence that purportedly links the defendant to the crime could well make an in-court identification highly suggestive, we direct that such information be disclosed under <u>Rule</u> 3:11 as well.

As we articulated in <u>Watson</u>, going forward, if a witness fails to make a positive identification prior to trial, the State must show that an in-court

37

identification would be <u>more</u> reliable than the failed pretrial identification, taking into consideration the suggestiveness of being in the courtroom. <u>Id.</u> at ___ (slip op. at 30). As this Court noted in <u>Henderson</u>, "[m]emory decay 'is irreversible'; memories never improve" with time. 208 N.J. at 267. There is no reason to think that Rosette's memory had improved such that she could give a reliable first-time identification in court, over two years after the crime occurred, despite failing to identify defendant as the perpetrator three days after the home invasion.

The circumstances of Rosette's in-court identification were highly suggestive, and therefore, the identification should have been excluded.

IV.

An appellate court may reverse a trial court's judgment if the cumulative effect of a series of errors is so great as to deprive a defendant of a fair trial. <u>Pellicer v. Saint Barnabas Hosp.</u>, 200 N.J. 22, 53 (2009). Cumulative error analysis does not "simply entail[] counting mistakes, because even a large number of errors, if inconsequential, may not operate to create an injustice." <u>Id.</u> at 55. Rather, "the predicate for relief for cumulative error must be that the probable effect of the cumulative error was to render the underlying trial unfair." <u>State v. Wakefield</u>, 190 N.J. 397, 538 (2007). "[I]f the combined effect of multiple errors deprives a party of a fair trial, an appellate court

should order a new trial." Torres v. Pabon, 225 N.J. 167, 191 (2016) (discussing Pellicer, 200 N.J. at 55-57).

In the present matter, the trial court allowed the jury to hear two significant pieces of unreliable evidence that purportedly connected defendant to the robbery: Special Agent David's testimony placing defendant's phone at or near the crime scene and Rosette's first-time in-court identification that defendant was the intruder. During closing arguments, the prosecutor encouraged the jury to rely on Special Agent David's testimony, stating it was "the most credible" testimony of the witnesses, as he was a qualified expert and certified FBI CAST agent. The State again showed the jury Special Agent David's maps during summation -- including the illustration of the 8:02 p.m. pinged Parkway Tower, with the tower's arms extending approximately one mile each -- which placed the marked crime scene within the tower's estimated coverage area. The State emphasized, with the maps on display, that Special Agent David's testimony reliably confirmed that defendant's phone pinged the approximate area of the crime scene at the time of the invasion.

The State also articulated during summation that Rosette's in-person identification was credible, because "a picture is a lot different than seeing someone in person." Rosette was the only witness who identified defendant as the intruder. In conjunction with Special Agent David's testimony, her

39

identification could have had a serious impact on the jury's perception of defendant's guilt or innocence.  See Watkins v. Sowders, 449 U.S. 341, 352 (1981) (Brennan, J., dissenting) ("There is almost nothing more convincing [to a jury] than a live human being who takes the stand, points a finger at the defendant, and says 'That's the one!'" (footnote omitted)).  Her testimony, of course, also raises serious due process concerns because of the likelihood of misidentification.  See Henderson, 208 N.J. at 285 (announcing a new rule of law based on the recognition that "suggestive police procedures may 'so irreparably "taint[]" . . . out-of-court and in-court identifications' that a defendant is denied due process") (alteration in original) (quoting State v. Madison, 109 N.J. 223, 239 (1988)); see also Neil v. Biggers, 409 U.S. 188, 198 (1972) ("It is the likelihood of misidentification which violates a defendant's right to due process.").  These constitutional ramifications, which we underscored in Watson, ___ N.J. at ___ (slip op. at 22-24, 29), magnify the harmfulness of the trial court's error.

It is true that the State relied on other evidence throughout trial and during summation, namely defendant's DNA on the Costco bag, the pictures of the Princess watch on defendant's phone, and the similarity of the voice announcements from the intruder's cell phone and defendant's cell phone. Balancing that evidence against the force of the improperly admitted evidence

that was stressed by the prosecutor in summation, however, we cannot conclude that the evidentiary errors in this case, considered in tandem, were inconsequential or harmless. See R. 2:10-2. Rather, we find the cumulative error impacted and prejudiced the fairness of defendant's trial. Therefore, defendant's conviction and sentence of life without the possibility of parole must be vacated and a new trial granted.

At a retrial, the State may not ask Rosette to identify defendant again. Given the highly suggestive nature of Rosette's prior in-court identification, the likelihood of an irreparable misidentification at this point is substantial. See Watson, ___ N.J. at ___ (slip op. at 34-35).

V.

For the foregoing reasons, we reverse the judgment of the Appellate Division and remand the matter for a new trial consistent with this opinion.


CHIEF JUSTICE RABNER; JUSTICES WAINER APTER and FASCIALE; and JUDGE SABATINO (temporarily assigned) join in JUSTICE PIERRE-LOUIS's opinion. JUSTICE SOLOMON filed a dissent, in which JUSTICE PATTERSON joins.

State of New Jersey,

Plaintiff-Respondent,

v.

Roberson Burney, a/k/a Robert
Burney, John Burney, Robin Burney, and
Michael Langford,

Defendant-Appellant.

JUSTICE SOLOMON, dissenting.

I concur with the majority that the trial court should not have admitted

Special Agent David's testimony that the cell towers near the crime scene had

a coverage area of an approximate one-mile radius, based on his "rule of

thumb" policy. Ante at ___ (slip op. at 26-33). I also agree that the court

should not have permitted Rosette Martinez to identify defendant for the first

time in court. Ante at ___ (slip op. at 33-37). I part company with the

majority, however, in its assessment that despite the overwhelming evidence

establishing defendant's guilt, those errors were not harmless. Ante at ___

(slip op. at 37-39).

Indeed, the sheer volume of competent evidence against defendant --

most notably his DNA on the Costco shopping bag found at the scene, the

photographs of Martinez's unique watch on his phone, and the corresponding

1

testimony about the intruder's text message alerts and the taking of photographs -- leads to the inescapable conclusion that defendant was convicted in a fair trial, and any error was harmless. Accordingly, I respectfully dissent from the majority's judgment.

## I.

### A.

Whether the errors defendant complains of deprived him of a fair trial, and therefore warrant a reversal of his conviction, is governed by Rule 2:10-2, which provides that

> [a]ny error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result, but the appellate court may, in the interests of justice, notice plain error not brought to the attention of the trial or appellate court.

An error during a jury trial is therefore harmless unless there is a reasonable doubt that it contributed to the verdict. State v. Jackson, 243 N.J. 52, 72-73 (2020).

That determination requires consideration of the record as a whole, State v. Sowell, 213 N.J. 89, 108 (2013), and of the strength of the prosecution's case, see, e.g., State v. Derry, 250 N.J. 611, 634 (2022) ("[W]e rely on the overwhelming evidence against defendants to conclude that the error in admitting [disputed] testimony as lay opinion testimony was harmless."); State

2

v. J.L.G., 234 N.J. 265, 306 (2018) (holding that the error in admitting unreliable medical-related expert testimony was "harmless in light of the overwhelming evidence of [the] defendant's guilt"); State v. Rochat, 470 N.J. Super. 392, 442 (App. Div. 2022) (remanding for a new trial after finding that DNA evidence was unreliable because the court "d[id] not find [the remaining] evidence to be overwhelming").

Thus, the issue is "whether in all the circumstances there was a reasonable doubt as to whether the error denied a fair trial and a fair decision on the merits." State v. Macon, 57 N.J. 325, 337-38 (1971); see also State v. Lazo, 209 N.J. 9, 26 (2012). When, as here, the error is the improper admission of evidence, an error is harmless "if the untainted evidence . . . is so overwhelming that in the judgment of the reviewing court conviction was inevitable." State v. Pillar, 359 N.J. Super. 249, 276 (App. Div. 2003) (citation omitted).

B.

In this matter, the State presented overwhelming evidence of defendant's guilt that did not rely on Agent David's improperly admitted comment about his one-mile radius "rule of thumb" policy or on Martinez's in-court identification of defendant.

The Appellate Division held that the trial court did not abuse its discretion in permitting Agent David's expert testimony because "[i]t was for the jury to decide whether his testimony was credible and how much weight to give it." State v. Burney, 471 N.J. Super. 297, 320 (App. Div. 2022). The Appellate Division also concluded that although the conduct was "suggestive," any theoretical error in admitting Martinez's first-time in-court identification of defendant was harmless because of "the overwhelming evidence that defendant was the robber." Id. at 329-30. Although I disagree with the Appellate Division's evidentiary rulings, I agree that any potential error in admitting the evidence was harmless.

First, Martinez testified that when she answered the door at her home on December 25, 2015, and was confronted with an armed intruder, she believed that she recognized the perpetrator as a person who had recently worked in her home. Her testimony about that identification was corroborated by evidence of the 9-1-1 call that she made immediately after the robbery, in which she told the dispatcher that the intruder had "worked at our house." This is also consistent with her statement to police. Moreover, defendant admitted that he had indeed participated in contracting work at Martinez's home, and his brother Mark, a contractor, confirmed that to be true.

4

Second, Martinez reported to the police that the intruder stole jewelry. When police searched defendant's cell phone, they found photographs of a watch engraved with the word "Princess." Detective Alfonso testified that the manufacturer of the watch was "Princess." Defendant's metadata revealed that the photos were taken with his cellphone just days after the robbery, between December 26 and December 29. Defendant also searched online for "Princess" watches during that time. Thus, defendant's cellphone was used to document the specific type of watch and his research regarding that watch in the immediate aftermath of the robbery.

Martinez not only identified the watch by viewing the photographs, but also testified to its details -- that it had a black band, was adorned with clear rhinestones, and had the word "Princess" engraved on the inside. She also provided Detective Alfonso with the watch's packaging and additional bands as further proof that the watch was hers. In short, if accepted by the jury, Martinez's testimony, the packaging, and bands demonstrate that the perpetrator stole the precise type of watch that defendant's cell phone had photographed and researched just days after the robbery.

Third, defendant's DNA was found on a Costco bag hanging in the stairwell leading to Martinez's apartment. Martinez testified that the day after the robbery, she noticed the bag, which she did not recognize. She

5

additionally testified that neither she nor her daughter, Samantha, had a Costco membership. She identified the bag as one of several that appeared in a photograph taken after the robbery. There was no definitive testimony about how long the Costco bag had been in the stairwell, but Martinez's testimony that she did not recognize the bag and noticed it for the first time the day after the robbery supports the State's contention that it was brought to the apartment at the time of the robbery. Additionally, the presence of defendant's DNA on that bag is compelling evidence that he was the intruder.

Fourth, the victims testified that they heard the intruder's phone sound during the home invasion. Martinez recalled hearing an automated voice assistant announce an incoming call or text message from a name that she could not recognize. Her daughter, Samantha, testified that she heard the phone announce an incoming text message and recalled the man answering a call at one point. A third victim, Samantha's friend, also testified that she heard an "incoming message" announcement from the phone's automated voice. The victims' testimony about the intruder's cellphone -- signaling its receipt of a text message -- directly matched evidence derived from the search of defendant's phone. Indeed, the search of defendant's phone confirmed that he had received a single text message at 8:02 p.m. on December 25, while the robbery was in progress. This is consistent with the victims' testimony that

6

the intruder's cellphone had received a single text, audibly announced by his cell phone's automated voice during the robbery.

Fifth, all three victims testified that, while they were bound, they heard "click" noises, signaling that the robber was taking photos with his phone. The search of defendant's phone revealed several blurry, dark photographs, taken at 8:03 p.m. on December 25, while the robbery was in progress. Also found on defendant's phone were photographs taken after the robbery, identified by Martinez as photographs of her "Princess" watch.

As the appellate court explicitly noted, "even if the in-court identification had been suppressed, Rosette [Martinez] would still have identified her watch from the photographs stored on defendant's cell phone." Id. at 330.

Sixth, while questioning defendant at the hospital, Detective Alfonso texted defendant the word "hello." Defendant's phone then made an audible voice announcement of "message received" from Detective Alfonso's phone number and read the message aloud -- just as the victims described the intruder's phone did.

Seventh, the clothing that defendant was wearing when he was questioned at the hospital, described as a black knit wool hat, a winter jacket,

7

and a maroon jacket, matched the victims' description of the intruder: a tall, thin black male wearing a hat and dark clothing.

## II.

I concur with the Appellate Division's determination that the evidence against defendant, independent of the expert's improper comment and Martinez's in-court identification, is overwhelming.

I would affirm as modified the Appellate Division's determination affirming defendant's conviction. I respectfully dissent.